TRINITY CORPORATION (FORMERLY TRINITY LIFE BUILDING CORP.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 108957.    Promulgated August 12, 1941.

*Robert Ash, Esq.*, for the petitioner.
*Frank B. Schlosser, Esq.*, for the respondent.

OPINION.

DISNEY: Petitioner's first contention is that a corporation does not realize taxable gain by a sale of its assets for shares of its own stock.

Similar questions under earlier revenue acts have been before this Board and the courts. In *Helvering* v. *Reynolds Tobacco Co.*, 306 U. S. 110, the Court held that the taxpayer realized no gain under section 22 (a) of the Revenue Act of 1928 upon the sale in 1929 of treasury stock for amounts in excess of cost. The reasoning of the Court was that, as regulations since the 1913 Act had consistently ruled such gain to be free from tax, Congress had, by repeated re-enactments of the statutory definition of gross income, given the administrative construction the force of law, and that a change in the regulations by T. D. 4430, C. B. XIII–1, p. 36, on May 2, 1934, taxing gain realized in transactions of that nature, had no retro-active effect. The Court made no ruling on the prospective applica-tion of the new regulation. On April 17, 1939, the Commissioner, in view of the *Reynolds Tobacco Co.* case, revoked T. D. 4430, *supra*, in so far as it applied to the 1932, 1928, 1926, and 1924 Acts. T. D. 4895, C. B. 1939–1, p. 225. We extended the *Reynolds Tobacco Co.* case to the 1934 Act in *National Home Owners Service Corporation*, 39 B. T. A. 753.

Article 22 (a) (16) of Regulations 94, promulgated under the Rev-enue Act of 1936, to the extent material here, follows T. D. 4430, *supra*. It provides, in part, as follows:

Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. * * *

But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. * * *

It is evident that the regulation was intended to cover transactions such as the one involved herein, i. e., that shares of petitioner's capital stock received as consideration in the exchange must be included in the computation of gain or loss at its fair market value. Petitioner took the stock up on its books and reported it in its 1937 return in computing gain or loss on the transaction at a fair market value of $194,365.28. Is the regulation valid without a change in the statute?

The question appears to be answered by *Helvering* v. *Wilshire Oil Co.*, 308 U. S. 90. The issue there turned upon whether regulations promulgated on February 15, 1929, under the 1928 Act, requiring the deduction of development expenses in computing net income from oil property, were valid as to the years 1929 and 1930, notwithstand-ing admitted prior practice of the Commissioner to compute income under earlier acts, without regard to development expenditures. It

was argued by the taxpayer that, as the practice under earlier acts was known to Congress through repeated reenactments of the statute without change, the rule could not be altered without legislative approval. The Court assumed that the administrative construction under the 1921 Act had received Congressional approval in the 1924 Act. The regulations under the 1926 Act contained no comparable provision, but the Commissioner undertook to follow the practice subsequently incorporated in regulations under the 1928 Act. This change of administrative interpretation had the effect of restoring to the statutory provision its original ambiguity and the phrase in question became susceptible to new administrative construction. Thus in that case the practice of the Commissioner under the 1924 and prior acts was undergoing a change while the 1926 Act was in full force and effect. Notwithstanding this circumstance, the Court held that the changed regulation promulgated under the 1928 Act had prospective application. The Court said: "It [the rule that administrative interpretation of a statute receives legislative approval upon reenactments of the law wthout material change] does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers." In *Helvering* v. *Reynolds*, 313 U. S. 428, the changed regulation was not promulgated until after the transaction in question had been consummated, but the Court held that it was applicable. Here the new regulation was put into effect while the 1934 Act was being considered by Congress and was in operation at the time of the passage of the 1936 Act. Accordingly, there was some legislative recognition of T. D. 4430 in the enactment of the 1936 Act.

In *National Manufacture & Stores Corporation* v. *Allen* (U. S. Dist. Ct., Mid. Dist. Ga., Nov. 2, 1940), the court held that the change made in the regulations in 1934 had no application to the 1936 Act, upon the ground that the old regulation had come to have the force and effect of law through reenactments of the statute in the same language and that the meaning could be changed only by Congress. There was no appeal from the decision. The *Wilshire Oil Co.* case is not discussed in the opinion of the court. We think the court's conclusion is contrary to the reasoning of the Supreme Court in the *Wilshire Oil Co.* case and decline to follow it here.

In *Helvering* v. *Janney*, 311 U. S. 189, the decision turned primarily upon the meaning of the statute, unaided by administrative construction, and the amendment to the regulations was not made until after the taxable year. Regulations of the Commissioner did not control the conclusion in *Helvering* v. *Oregon Mutual Life Ins. Co.*, 311 U. S. 267. *Hammond Iron Co.*, 41 B. T. A. 86, involved

tax for 1933 under the 1932 Act and was controlled by the *Reynolds Tobacco Co.* case.

The transaction is clearly within Regulations 94, article 22 (a) (16), *supra.* Petitioner and the Commercial Co. were separate taxpayers, notwithstanding the fact that prior to the transfers the latter corporation owned all of the stock of the former. Petitioner received in the deal, as part of the consideration for the property given up, 2,920 shares of its own stock, which stock it could have sold to third parties, subject to the restrictions imposed upon it by the transfer agreement. The Commercial Co. remained the sole stockholder of petitioner only by reason of the failure of petitioner to dispose of the stock received in the exchange.

The liability of the petitioner for a tax on the exchange is not controlled by the manner in which it recorded the transaction on its books. *Doyle* v. *Mitchell Bros.*, 247 U. S. 179. The gain, if any, will be determined by including in the computation, as part of the amount realized in the exchange, the 2,920 shares of stock at fair market value thereof.

Petitioner requests us to find that the stock had no fair market value. Two witnesses presented by petitioner, testifying as experts, in response to hypothetical questions testified that the stock had no value on the basic date. Although the hypothetical questions contained facts in addition to the book earnings and losses of the petitioner, these witnesses based their opinions largely upon lack of earnings of the corporation prior to the basic date. Alleged restrictions on the stock, including voting privileges, were other factors entering into lack of value. One witness attached no significance to the sales in 1935 and 1938 of shares of the stock at $125 and $73 per share, respectively, and that a purchase of 2,920 shares would give the buyer control of the corporation. The other witness acknowledged that the stock had value if the purchaser had need for a substantial part of the office space in the building. This witness, who was the president of the Commercial Co. and vice president of petitioner, further testified that the price of $125 per share paid for the stock in 1935 was a fair price in view of the fact that the purchaser needed space in the building for its growing business.

The sale of the stock in question was not impossible, as in *Helvering* v. *Tex-Penn Oil Co.*, 300 U. S. 481. The stock was pledged as security for the faithful performance of the contract to renew the ground lease, but a sale could have been made subject to the pledge. The other cases cited by the petitioner involved restrictions against the sale of the stock which are not present here. Shares of the stock were sold by the petitioner to the Commercial Co. in 1938 without any proof of alteration in the guaranteeship to permit the transaction. An assumption that the stock could not be voted until 1987

was one of the facts forming one of the hypothetical questions. Petitioner had the right to vote the stock. The Commercial Co. held a controlling interest in petitioner and had a common management with it and therefore was in a position at all times to sell or withhold the stock from sale, if necessary to terminate the escrow agreement. We do not think the evidence establishes that the stock had no fair market value.

The evidence supports the determination of the respondent. There was a sale of all petitioner's stock in 1935 for $125 per share and this price was regarded by one of petitioner's witnesses as a fair price, considering the purpose for which the buyer desired the stock. In 1938 the same buyer purchased 320 shares of the stock at a price of $73.34539 per share, an amount equal to its book value, which was the fair market value determined by the respondent. The Commercial Co., the sole stockholder of petitioner, declared in a report to the Treasury Department that the stock had a fair market value of $125 per share in 1937. The Trinity Building, petitioner's principal asset prior to the exchange, had a depreciated cost of about $600,000 and was appraised as of January 1, 1938, at a present worth of about $730,000. The stock in question was entered in petitioner's books at a value of $194,365.28.

The evidence before us does not warrant a disturbance of the respondent's finding that the stock had a fair market value of $214,168.54. Accordingly,

*Decision will be entered for the respondent.*