New York Stocks, Inc. v. Commissioner.
New York Stocks, Inc. v. Commissioner
Docket Nos. 107007, 108211.
United States Tax Court
1943 Tax Ct. Memo LEXIS 453; 1 T.C.M. (CCH) 590; T.C.M. (RIA) 43077; February 12, 1943
*453 Harris Berlack, Esq., 1 Wall St., New York City, for the petitioner. Charles Oliphant, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined deficiencies in income tax for the fiscal years ending May 31, 1938, and May 31, 1939, in the amounts shown below. Hereinafter the years will be referred to simply as 1938 and 1939, respectively. Docket No.
Year
Deficiency
107007
1938
$55,451.11
108211
1939
7,497.20
Although several issues are raised by the pleadings with reference to the deficiency for 1938 it is necessary to discuss them in detail inasmuch as respondent now concedes the petitioner is entitled to a "Deficit Credit" under section 501 (a)(3)(f) of the Revenue Act of 1942 in an amount equivalent to its adjusted net income. Decision of no deficiency in tax for that year will accordingly be entered. Most of the issues pertaining to the deficiency for 1939 have been waived, conceded, or have become moot. Respondent now admits that petitioner, during the taxable year, was a mutual investment company within the meaning of section 361 of the Revenue Act of 1938, and that it is entitled to the relief *454 afforded by section 170(c) of the Revenue Act of 1942. He, therefore, concedes it is entitled to a basic surtax credit in the amount of $170,744.40. Petitioner concedes that the decision of the Supreme Court in Spreckels v. Commissioner, 315 U.S. 626, requires determination against it in connection with its claim for deduction of brokerage commissions on sales of securities. Issue 6 has become moot. This leaves but two issues: (1) Whether respondent erred in determining that $23,200.02, referred to in petitioner's return as "Redemption and Conversion Charges", was properly included in gross income (Issue 3); and (2) Whether he erred in refusing to allow petitioner a deduction of $11,578.81 as ordinary and necessary business expenses, the amount having been paid in connection with the registration of its special stock with the Securities and Exchange Commission. (Issue 5) Petitioner's adjusted net income, as determined by the respondent, was $175,405.97. If both issues are determined against it there will be a deficiency in tax based upon the difference between this amount and the surtax credit referred to above. ($175,405.97 - $170,744.40 = $4,661.57.) *455 If either issue is decided in petitioner's favor there will be no deficiency. Findings of Fact Petitioner is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business in Jersey City, New Jersey. Its Federal income and excessprofits tax return for the taxable year was filed with the collector of internal revenue for the fifth district of New Jersey. Since its incorporation in June of 1936 petitioner has been engaged as an openend management investment company as those terms are defined in the Investment Company Act of 1940 (15 U.S.C. 80 a-5). It is registered with the Securities and Exchange Commission under said act as a diversified, open-end management investment company. Stated generally its plan of operation is substantially as follows: Petitioner's common stock is composed of 1,000 shares. It is authorized to issue special stock of $500,000 in 21 separate series, 500,000 shares in each, or a total of 10,500,000 shares, the various series being classified, for example, as Automobile Industry Series, Oil Industry Series, Steel Industry Series, Railroad Series, etc. Each series *456 is kept segregated from the portfolio of every other series and, as so segregated, is left in the custody of a bank. Purchasers of special stock in one series become entitled to their aliquot portions of the profits from the stock held in that series but only from the stock held in such series. The actual operation has been likened to a stick full of rings, the rings being put on one end of the stick as they fall off the other. In other words, the stock of a given series fluctuates through the retirement of outstanding special stock and the issuance, as occasion requires or justifies, of other special stock. In somewhat the same fashion the funds represented by the amounts paid in for special stock are invested in stocks of the series and, when necessary to retire portions of the special stock, are sold, the business being essentially that of raising capital, investing it, and buying and selling securities continuously. At the beginning of the year 1939 petitioner had outstanding 863,041 shares of special stock (in addition to 1,000 shares of common stock which did not change) and at the end of the year it had outstanding 1,203,088 shares of special stock. During the year 806,713 *457 shares of special stock were issued and 466,666 shares were redeemed or converted from one series into another. Under its plan of operation petitioner is required to pay to stockholders, upon redemption or conversion of their special stock, an amount equal to its then net asset value, less a fixed charge. Net asset value of each series is calculated substantially as follows: from the sum of (a) the cash included in the underlying assets; (b) any amounts receivable from shares which have been sold but not issued; (c) dividends received in respect of stock included in underlying assets; and (d) the value of securities and other assets included in the underlying assets, the liabilities chargeable to the series are deducted. The value of each share is determined by dividing the number of shares into the resulting figure. A fixed charge is provided for in the resolution of the board of directors in connection with redemption or conversion of the special stock. The amount of the charge is stated to be "an amount approximately equal to the average out-of-pocket expenses incurred by the corporation in connection with similar redemptions - which amount shall be fixed by the corporation from *458 time to time". The fixed charge for 1939 was 5 cents per share. (In the Government Bond series a smaller charge was made and in the case of conversions there was a service charge which does not enter into the present controversy.) The aggregate of the charges for 1939 was $23,200.02. The 5 cent charge was decided upon by the board of directors at the time of the organization of the company. It was not based upon actual experience, but was an arbitrary deduction estimated to be approximately equal to the out-of-pocket expenses. The type of expenses incurred in connection with redemption and conversions and which it was contemplated would be taken care of by the 5 cent charge consisted of transfer agent and registrar expenses, brokerage commissions, stamp taxes, if any, on the sale of underlying assets, postage, cost of issuing checks and kindred items of expense. In a prospectus issued by the company in 1937 it is stated, under the heading "Redeemable at the Request of Holder": Every registered holder of special stock of any series may, during any day on which the New York Stock Exchange shall be open, deliver to the corporation for redemption a certificate or certificates for *459 special stock of any series, properly endorsed, and the corporation shall thereupon redeem the same out of the underlying assets of such series by paying to such registered holder, in cash, the net asset value thereof less an amount approximately equal to the average out-of-pocket expenses incurred by the corporation in connection with similar redemptions - which amount shall be fixed by the corporation from time to time. The corporation shall apply, upon each redemption, an amount out of its capital equal to the aggregate par value of the shares so redeemed. The net amount payable on such redemption shall be paid by the corporation within three days after the determination thereof. At present the corporation charges 5 cents per share for such expenses, but said amount is subject to change from time to time on the basis of changes in the expenses of the corporation incident to redemptions. In Schedule H of its return, under the heading "Other Deductions", petitioner computed the amount which it carried to its return and deducted from gross income ($68,635.14) as follows: Research and advisory fee
$40,986.57
Custodian's fees and ex-
penses
4,938.67
Transfer agent's fees and
expenses
8,953.60
Registrar's fees and ex-
penses
2,576.00
Legal and Audit fees
15,675.33
Insurance, supplies, tele-
phone, etc
3,187.95
Director's fees
1,380.00
Miscellaneous expenses
14,135.04
$91,835.16
Deduct - Redemption and Conver-
sion Charges
23,200.02
$68,635.14
*460 Respondent made no adjustment in connection with the $23,200.02 item shown in the above schedule. Petitioner claims that it was improperly included in gross income. During 1939 petitioner expended $11,578.81 for printing, legal fees, accounting fees, and registration fees in connection with the registration of its special stock with the Securities and Exchange Commission under the Securities Act of 1933. In its return for the year 1939 petitioner deducted $11,578.81 as "Stock Registration Expenses, charged to paid-in surplus". The Commissioner determined that the amount was not deductible. Opinion Petitioner argues that the 5 cent charge represented a small fraction of the total asset value withheld from the redeeming shareholder to maintain the value of the remaining outstanding shares at approximately the same level as if no shares had been redeemed. It insists it actually received nothing; that the charge was simply a factor in computing the purchase or redemption prices of the stock converted or redeemed; and that it could not possibly result in income, profit or loss to it. The evidence, in our judgment, does not support this view but tends to show that petitioner treated *461 the aggregate of the charges correctly in its income tax return. The exhibits, evidence, and examples given by the witnesses all indicate clearly that the net asset value of the shares was determined independent of, and prior to collecting the charge. In other words, under petitioner's plan of operation, after determination was made of the amount the withdrawing shareholder was entitled to receive, he was charged with an additional 5 cents per share for the purpose of securing from him the "out-of-pocket" expenses incurred by the corporation in connection with his withdrawal. Thus, for example, when a holder of "Agricultural Industry Series" withdrew or converted a share owned by him on December 16, 1938, its net asset value was determined to be $8.07. The amount paid to him, however, was $8.02. It seems obvious that the additional 5 cents was thereupon and thereby received by petitioner to reimburse it for such "out-of-pocket" expenses as it was required to pay as a result of the withdrawal. Petitioner's contention that it was simply a factor in computing the redemption price, or, as stated by it upon brief, "an amount withheld to maintain the value of the remaining outstanding *462 shares at approximately the same level as if no shares had been redeemed," is, therefore, not established. Moreover it is clear from the testimony of petitioner's president that the collection of the charge was for the express purpose of reimbursing it for expenditures made by it. It was to pay the various items mentioned - fees and expenses of transfer agents, registrar expenses, brokerage commissions, stamp taxes on the sale of underlying assets, postage, costs of issuing checks and, in the language of the witness "a million and one things that cannot be enumerated" - items which if paid by petitioner constituted ordinary and necessary expenses of carrying on its trade or business. When petitioner aggregated the total amount expended for these purposes it determined an amount which, in the absence of any other factors, could be deducted from gross income under section 23 of the Internal Revenue Code. But inasmuch as it had been reimbursed for some of the expenses it properly deducted from its gross income only the net amount it was required to pay. This properly reflected income; for if the reimbursements exceeded the expenditures a profit resulted while if the expenditures exceeded *463 the reimbursements gross income was reduced pro tante. Upon brief petitioner discusses at some length section 19.22(a) - 16 of Regulations 103. The section provides that whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all the facts and circumstances. It states that if a corporation deals in its own shares as it might in the shares of another corporation the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. The gist of petitioner's argument is that the regulation is probably invalid in the absence of a legislative amendment of section 22(a) of the Internal Revenue Code or of the revenue acts. This was suggested by the court in E. R. Squibb & Sons v. Helvering, 98 Fed. (2d) 69, 70 when it stated that the old regulation, providing that no gain or loss is realized from the purchase or sale by a corporation of its own stock, may have become "imbedded in the statute so deep that only legislation could dislodge *464 it." Cf. National Home Owners Service Corporation, 39 B.T.A. 753; R. C. Reynolds, Inc., 44 B.T.A. 356. See, however, Trinity Corporation, 44 B.T.A. 1219; affd., 127 Fed. (2d) 604, certiorari denied, 63 S. Ct. 47; Brown Shoe Co., 45 B.T.A. 212 (on appeal S.C.C.A.) Edison Brothers Stores, Inc., 45 B.T.A. 472; and Allen v. National Manufacture & Stores Corp., 125 Fed. (2d) 239. As we view it, however, this question may be passed; for such profit as this petitioner may have made, if any, it cannot be determined on this record whether a profit or a loss actually eventuated - did not result from the purchase or sale of its stock in the manner contemplated by the regulation. Under its plan of operation a gain could have resulted to it only if it collected from its retiring shareholder more than it paid out for expenses incident thereto. What has been said is dispositive of the present issue. At the risk of unnecessarily extending the discussion *465 it may be pointed out there is considerable doubt petitioner was "dealing" in its own stock. Passing the question of its power to do so, it will be noted that under the resolution authorizing the issuance of the 10,500,000 shares it is provided that all stock received upon redemption shall "have the status of authorized and unissued shares * * * and may be reissued from time to time * * *." Examining the provisions with reference to the issuance of shares it is noted that the "net asset value * * * [is to be] the basis of the issue price of all shares" and the corporation is to "receive as the consideration therefor a sum in cash not less than the net asset value." Since this is also the basis upon which the stock is secured from the withdrawing shareholders (except for the 5 cent charge) it is obvious that gain or loss may result only when there is a variation between the amounts received and the amounts paid out; but even this would not be a gain or loss to the corporation since the amount would inure to the benefit of, or fall upon, the remaining shareholders in that particular series. Petitioner's contention that the $23,200.02 constituted a capital gain is untenable. As pointed *466 out above it did not result from the sale of a capital asset but rather from a reduction in the amount of ordinary and necessary expenses of carrying on its trade or business. If this fortuitously resulted in gain - which, as pointed out above, has not been shown - there is no reason to exempt it from tax. If, on the other hand, it reduced petitioner's income it would seem that it should be allowed. We accordingly conclude and hold that the amount was treated correctly by both parties and that petitioner's present contention cannot be sustained. The remaining issue is whether the $11,578.81 paid for printing, legal fees, accounting fees and registration fees in connection with the registration of the special stock with the Securities and Exchange Commission is deductible as an ordinary and necessary business expense. The facts shown in our findings are taken from the stipulation of the parties and they were not elaborated upon or discussed in the evidence. The expenditures seem to have been incident to the issuance of new capital stock. Such expenditures have uniformly been held to be not deductible as ordinary and necessary expenses. Emerson Electric Manufacturing Co., 3 B.T.A. 932; *467 Holeproof Hosiery Co., 11 B.T.A. 547; Commercial Investment Trust Corporation, 28 B.T.A. 143, affirmed 74 Fed. (2d) 1015; Baltimore & Ohio Railroad v. Commissioner, 78 Fed. (2d) 460; Firemen's Insurance Co., 30 B.T.A. 1004. This issue must be and it is decided in favor of respondent. Decision will be entered under Rule 50.