Tennessee Consolidated Coal Company v. Commissioner.
Tennessee Consol. Coal Co. v. Commissioner
Docket No. 110960.
United States Tax Court
1943 Tax Ct. Memo LEXIS 71; 2 T.C.M. (CCH) 924; T.C.M. (RIA) 43466; October 22, 1943
*71 George E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., and Paul E. Schaub, C.P.A., for the petitioner. Charles P. Bagley, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined deficiencies in income and excess profits taxes of petitioner for the calendar year 1939 in the respective amounts of $8,598.79 and $134.93. By amended answer he seeks increased deficiencies. At the hearing he conceded that his request for increased deficiencies was groundless. The sole issue is whether the respondent erred in determining that petitioner realized taxable gain of $45,939 in 1939 from the purchase in that year of $94,000, face value of its own bonds, for $48,061. Findings of Fact Petitioner is a corporation engaged in the mining and selling of coal with its principal office at Tracy City, Tennessee. Its return for 1939 was filed with the collector of internal revenue for the district of Tennessee. In 1920 petitioner issued five hundred $1,000 "Purchase Money First Lien Six Per Cent Sinking Fund Gold Bonds" to purchase a tract of coal land of about 17,000 acres known as the Syndicate Tract. The bonds were redeemable on any *72 interest day at face and accrued interest upon previous notice of not less than sixty days given by the issuing company in the manner prescribed by the indenture. The bonds matured in 1940 and were secured by a first lien on the property. The mortgage securing the bonds provided that petitioner should make certain sinking fund payments to a trustee. The payments were to be at the rate of five cents per ton of coal actually mined from the mortgaged property. A minimum of 100,000 tons was fixed for the year ending August 31, 1923, which minimum was increased by 100,000 tons each year until a minimum of 500,000 tons was fixed for the year ending August 31, 1927, and for each year thereafter. Petitioner agreed that if the coal mined during any period was less than the guaranteed minimum, it would make sinking fund payments on the basis of such guaranteed minimum. Upon receipt of the sinking fund payments, the trustee is required to advertise for offers to sell the bonds and to use the sinking fund in purchasing bonds to the extent of any offers received. Provision is also made for the retirement, at face, of bonds selected by lot in the event the trustee is unable to purchase a sufficient *73 number, at or below par, to utilize the entire sinking fund. All bonds so purchased are required to be cremated by the trustee, who then sends petitioner a certificate setting forth the number of bonds so purchased and cremated. The trustee is also required to furnish petitioner with a statement of the bonds purchased and cremated by it, and the balance left in the sinking fund. The mortgage indenture provides that in the event of a default in the payment of the principal of any of the bonds, or of a default in the interest or sinking fund payment which continues for six months, the trustee may enter into and take possession, and upon written request of the holders of a majority in amount of the outstanding bonds, declare the principal of all outstanding bonds, if not already due, to be due and payable immediately. The trustee may assume, however, that no default has occurred until it receives written notice to the contrary from holders of a majority of the outstanding bonds, and it is not required to take any action in respect to any default, which in its opinion involves expense or liability, unless requested in writing to do so by holders of a majority of the outstanding bonds. *74 Section 18 of Article VI of the indenture provides as follows: Section 18. No holder of any bond or coupon shall have any right to institute any suit, action or proceeding at law or in equity for the foreclosure of this indenture, or for the execution of any trust hereof, or for the appointment of a receiver, or for any other remedy hereunder, unless such holder shall have previously given the Trustee written notice of the default complained of, and the continuance thereof, as hereinbefore provided, nor unless also the holders of twenty-five per cent in amount of the bonds then outstanding, shall have made written request upon the Trustee, and shall have offered to the Trustee reasonable opportunity either to proceed to exercise the powers hereinbefore provided, nor unless also the holders of twenty-five per cent in amount of the bonds then outstanding, shall have made written request upon the Trustee, and shall have offered to the Trustee reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit or proceeding in its own name, nor unless such holder or holders shall have offered to the Trustee adequate security and indemnity *75 against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee shall have thereupon refused or neglected to comply with such request within a reasonable time thereafter. Such notification, request and indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts of this indenture and to any action or cause of action for foreclosure, or for the appointment of a receiver, or for any other remedy hereunder, it being understood and intended that no one or more holders of bonds or coupons shall have any right, in any manner whatever, to affect, disturb or prejudice the lien of this indenture by his or their actions, or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided, and for the equal benefit of all holders of such outstanding bonds and coupons. The bonds issued by petitioner were all in the same denomination and were all alike except for numbers. They were payable at the office of the trustee, which was originally the Equitable Trust *76 Company of New York and later the Chase National Bank. No one but the trustee has authority to cancel the bonds. The bonds, unless registered, were negotiable and were payable to bearer. Coupons for the interest payments were attached to each of them. After issuance the bonds were endorsed in four respects. The first endorsement reduced the minimum tonnage on which sinking fund payments were based to 100,000 tons in consideration of petitioner agreeing to contribute to the sinking fund the net proceeds of the sale of timber removed for commercial profit from the mortgaged property. The second, in 1933, reduced the interest rate on the bonds from six to three percent for a period of approximately four years. The third modified petitioner's agreement to pay the bonds in gold. The fourth extended the due date of the bonds to 1960 and reduced the interest rate to 4 1/2 per centum, pursuant to a supplemental indenture entered into by petitioner on January 28, 1937, under the terms of which it agreed to pay to the sinking fund an additional amount of one cent per ton on all cleaned and washed coal sold by it. The four endorsements were placed by the trustee on all of the outstanding bonds. *77 The bonds were called in for that purpose. Petitioner began purchasing its own bonds in 1927. They were placed in its investment account along with other securities owned by it. The record does not show the bonds purchased, sold, cashed or otherwise disposed of during the years intervening between 1927 and 1939. Some (the amount and details not shown) were at one time sold to its president. At another time some were given "as a dividend to stockholders." None has ever been sold by petitioner to other persons. At the beginning of 1939 the balance in petitioner's investment account was $113,002.02. The number of its bonds then owned by it or the amount of the investment account applicable thereto is not shown. During 1939 additional bonds previously issued by petitioner were acquired on the dates and for the amounts shown: Bonds
Cost
March 17, 1939
4 - $1,000
$ 4,000.00
March 31, 1939
60 - 1,000
30,000.00
December 28, 1939
30 - 1,000
14,061.00
Total
94
$48,061.00
At the end of 1939 petitioner owned 143 of its own bonds. The balance in its investment account at that time was $142,363.02 of which $124,000 was applicable to the 143 bonds. The total number of bonds *78 then outstanding and which had not been cancelled by the trustee in the manner contemplated by the indentures was 335. During 1940 petitioner surrendered to the trustee for cancellation and cremation 8 of the bonds owned by it. Nine were also so surrendered in 1941 and 15 in 1942. In 1939 petitioner paid to the trustee $5,000. This amount was used by the trustee to purchase six $1,000 bonds, which were afterwards cancelled and cremated. In its income tax return for that year petitioner reported on line 7 "Interest on loans, notes, mortgages, bonds, bank deposits etc." - the words "Bond Disc." being added - $1,000 and this amount was included in its gross income. On its books and balance sheets petitioner treats all of its outstanding bonds as a liability. The specified interest payments on all uncancelled bonds are sent to the trustee and charged against operating costs. The coupons are clipped from the bonds held by petitioner in its investment account and sent through its local bank for payment. The amounts are credited to interest received. [1]
*79 The bonds, which had been issued by petitioner and purchased by it as set out above, had not been purchased with the intention of cancelling them immediately or of sending them at once to the trustee for the purpose of having them cancelled and cremated. The 94 bonds purchased by it in 1939 and presently in issue were, however, purchased by it for retirement. Opinion Petitioner contends that it did not realize income during the taxable year as a result of the purchase of its bonds because they were not to be cancelled but were to be held as an investment. There was some testimony to that effect; but we have concluded the 94 bonds presently in issue were actually purchased for retirement. While the finding is dispositive of the sole issue it is desirable to discuss the applicable legal principles and the arguments and contentions of the parties. The questions raised by the parties stem largely from United States v. Kirby Lumber Co., 284 U.S. 1, and Helvering v. American Chicle Co., 291 U.S. 426. The applicable regulation (Art. 545 (1) (c), Regulations 62) provided that if a corporation purchases and retires any of *80 its bonds at a price less than the issuing price or face value the excess of the issuing price of face value over the purchase price is gain or income for the taxable year. If the converse were true a deductible expense was allowable. (Subdivision (b) of same article.) The court stated it saw "no reason why the Regulations should not be accepted as a correct statement of the law." United States v. Kirby Lumber Co., supra.
The implied dualism in the regulation as it then appeared - purchase and retirement in the same year - engendered controversies. Thus in Garland Coal & Mining Co., 28 B.T.A. 348, affirmed 75 Fed. (2d) 663 - promulgated by the Board June 9, 1933 - the taxpayer contended that where bonds were purchased in 1928 but not surrendered to the trustee for cancellation until 1929 the regulation was not applicable. The Board pointed out that the bonds had been effectively withdrawn from circulation and, for all practical purposes, had been taken up and paid. It was said: "If the regulations were construed to mean that bonds must be completely canceled before gain or loss is recognized, *81 then, in our opinion, such regulations would not correctly interpret the law." In Virginia Iron, Coal & Coke Co., 29 B.T.A. 1087 - promulgated February 13, 1934 - the contention of the petitioner that the income derived by it from the purchase of its bonds accrued during the year in which the purchase took place and not in the year in which they were actually cancelled and retired was sustained on the authority of the Garland Coal & Mining Co. case. Both cases were cited with approval and followed by the Board in Montana, Wyoming & Southern Railroad Co., 31 B.T.A. 62, affirmed 77 Fed. (2d) 1007, certiorari denied 296 U.S. 604. This, then, was the apparent view of the courts and the Board when the Commissioner promulgated Regulations 86 under the Revenue Act of 1934 (February 11, 1935) in which he, in Article 22 (a)-18, (1) (b) and (c) re-enacted the earlier regulation but eliminated therefrom the words "and retires." The regulation, as so amended, remained unchanged in those issued under the Revenue Acts of 1936 and 1938 and under the code. (See Article 22 (a)-18, *82 Regulations 94 and 101; Article 19.22(a)-18, Regulations 103.) Respondent urges that he may change his regulations, prospectively, without specific statutory authorization, Helvering v. Wilshire Oil Co., Inc., 308 U.S. 90; Helvering v. Reynolds, 313 U.S. 428; that his action, effectuating a change under a comparable situation (a corporation dealing in its own stock) has been approved, Allen v. National Manufacture & Stores, Corp., 125 Fed. (2d) 239, certiorari denied, 316 U.S. 679; Commissioner v. Air Reduction Co., Inc., 130 Fed. (2d) 145, certiorari denied 63 S. Ct. 201; Trinity Corporation, 44 B.T.A. 1219, affd. 127 Fed. (2d) 604, certiorari denied 317 U.S. 651; and to this may be added the tacit approval given to the new regulation by its continuance, without change, since 1934. Helvering v. Winmill, 305 U.S. 79; Taft v. Commissioner, 304 U.S. 351. Petitioner *83 insists, however, that substantive rights are determined by statute and cannot be affected by Treasury Regulations, Helvering v. Edison Brothers Stores, Inc., 133 Fed. (2d) 575, certiorari denied 63 S. Ct. 1166; that the function of regulations is limited to the administration of the law and the enforcement of rights given under it; that there is no sound reason for departing from the well-settled principle that gain or loss should be postponed until the securities are disposed of Palmer v. Commissioner, 302 U.S. 63; and that the intention of the corporation at the time of the purchase of the bonds - i.e. to retire or not to retire them - is the all-important criterion to be applied in determining whether it is then in receipt of income. While we incline to the belief that the amended regulation is valid, decision need not be predicated wholly on a holding to that effect. Accepting, as does petitioner, the premise that intention of the corporation at the time the purchase is made is important cf. Garland Coal & Mining Co. v. Helvering, supra, we examine the facts and circumstances which *84 show, or tend to show, what petitioner's intention was at the time of purchase. The only witness called by either party was petitioner's treasurer. No attempt will be made to review all of his testimony. He enumerated several reasons for making the purchase of the bonds - making a profit on them, earning interest decreasing the possibility of foreclosure in the event a default occurred and protecting itself against "just a few disgruntled stockholders." Also, as he expressed it, "to provide a cushion for another period which we saw is coming after this war, to enable us to continue paying the interest, if possible." He did not state that the bonds were purchased for resale but simply said they could have been resold. When asked whether any had ever been sold he replied that some had been sold at one time (date, amount, price and other particulars not given) to the president of the company and "another time we gave some * * * as a dividend to stockholders." None was ever sold to any other person nor is there is any evidence indicating that any attempt was ever made to sell any. At least twice the witness stated that there was no intention "of immediately cancelling * * * [the 94 bonds] *85 or sending them to the trustee" for cancellation. The use of the word "immediately" in this connection is significant. It comports with what was actually done. In other words, as we view the undisputed facts, they show that the bonds were being withdrawn from circulation by the company which issued them and that they were being held for cancellation by the trustee at such time as suited petitioner's convenience. In that connection it may be noted that while petitioner has been purchasing its bonds since 1927 not a single sale of such bonds has ever been made by it, except to its president under circumstances not shown. During this 16 year period, however, it has caused several blocks of the bonds which it owned to be cancelled by the trustee. These facts, we think, justify the conclusion which has been reached that the 94 bonds in issue were actually purchased for retirement. Transylvania Railroad Co. v. Commissioner, 99 Fed. (2d) 69, is distinguishable upon its facts and aids petitioner but slightly. In that case the lessee of a railroad - not the corporation which issued and purchased the bonds - was obligated to pay the interest on the bonds. The *86 record clearly indicated the corporation had acquired its bonds as an investment and intended to keep them alive in order to collect the interest. The payment and collection of interest by this petitioner, however, did not affect its income. It was in precisely the same position, so far as interest is concerned, as it would have been if the bonds had been cancelled in the year purchased. Its argument that it desired to be in a position to protect itself against the possibility of "a few disgruntled stockholders * * * [coming in and selling] the property from under" it is not persuasive. Section 18 of Article VI of the indenture, set out in our findings, provided for adequate safeguard against that eventuality. While we have not chosen to uphold the Commissioner's determination solely upon the assumption that the regulation, first adopted in 1934, is valid, we do not wish to be understood as holding it to be invalid. As pointed out in Montana, Wyoming & Southern Railroad Co., supra, upon the acquisition of bonds by the corporation which issued them its assets are reduced by the amount of cash expended for that purpose while its liabilities are reduced *87 by the face amount of the bonds so acquired. This, then, indicates that "by reason of the transaction there were 'made available * * * assets previously offset by the obligation of bonds now extinct' and this resulted in 'an accession to income.' Kirby Lumber Co., supra." The rationale of cases applying the doctrine of constructive receipt of income supports this view. Assuming for the purpose of this case, however, that a corporation may, as petitioner urges and as was recognized by the Circuit Court of Appeals in Garland Coal & Mining Co. v. Helvering, supra, "purchase its own bonds as an investment and reissue them" still, as the court pointed out, "in such a case the intention to keep the indebtedness alive must be clearly shown, for the general rule is that where an indebtedness is in fact paid, the evidences of it cannot be reissued for a new or different debt." Since no such clear showing has been made here we respectfully decline to disturb the respondent's determination. Decision will be entered for the respondent. Footnotes
1. This finding is based upon the testimony of petitioner's treasurer. The only interest received, specifically shown in the return, is the $1,000 referred to in our findings as "Bond Disc." It is probable that the amounts, which the witness states were credited to interest received, were included in gross income under line 13 of the return - "Other income, $14,602.18."↩