ARC REALTY COMPANY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64689–64691, 70296–70298.   Filed June 15, 1960.

*Gustavus A. Buder, Jr., Esq.,* for the petitioners.
*William A. Goffe, Esq.,* for the respondent.

BRUCE, *Judge:* These consolidated proceedings involve deficiencies in income tax and personal holding company surtax as follows:

---

[1] Proceedings of the following petitioners are consolidated herewith: Arc Realty Company, Docket Nos. 64689, 70296; Arcadia Realty Company, Docket Nos. 64690, 70297; Lydiade Investment Trust, Docket Nos. 64691, 70298.

| Docket No. | Petitioner | Year | Deficiencies | |
|---|---|---|---|---|
| | | | Income tax | Personal holding company surtax |
| 64689 | Arc Realty Co. | { 1951 | $12,686.25 | $3,673.68 |
| | | 1952 | 112.51 | 2,687.71 |
| 70296 | Arc Realty Co. | { 1953 | | 5,786.04 |
| | | 1954 | ¹ 175.89 | |
| 64690 | Arcadia Realty Co. | { 1951 | 8,798.24 | 2,021.15 |
| | | 1952 | 88.86 | 2,279.60 |
| 70297 | Arcadia Realty Co. | { 1953 | | 6,175.18 |
| | | 1954 | ¹ 1,436.74 | |
| 64691 | Lydiade Investment Trust | { 1951 | 29,406.58 | 3,295.12 |
| | | 1952 | 30.68 | 805.49 |
| 70298 | Lydiade Investment Trust | 1954 | ¹ 8,147.23 | |

¹ Including personal holding company tax.

Petitioners claim overpayments of income tax as follows:

| Docket No. | Petitioner | Year | Overpayment |
|---|---|---|---|
| 64690 | Arcadia Realty Co. | { 1951 | $34.01 |
| | | 1952 | 6,258.87 |
| 64691 | Lydiade Investment Trust | { 1951 | 22.62 |
| | | 1052 | 27.48 |
| 70296 | Arc Realty Co. | { 1953 | 7,925.33 |
| | | 1954 | ¹ 7,084.88 |
| 70297 | Arcadia Realty Co. | 1953 | 34.62 |
| 70298 | Lydiade Investment Trust | 1954 | ¹ 13,565.77 |

¹ Including personal holding company tax.

In addition, petitioner in Docket No. 70298 claims an overpayment in income tax of $3,320.63 for the taxable year 1953, a year in which the respondent did not determine a deficiency.

Both parties have made certain concessions on brief and in the stipulation of facts. The issues remaining for decision are as follows:

1. What is the basis of Star-Times Publishing Company 4 per cent second preferred stock for computation of gain or loss on sale of said stock in 1951 by petitioners Arc Realty Company (Arc), Arcadia Realty Company (Arcadia), and Lydiade Investment Trust (Lydiade)?

2. Are certain expenditures by Arc and Lydiade in 1951 and 1952 as Christmas gifts to Otto Eisenstein deductible as ordinary and necessary business expenses under section 23(a)(1)(A), I.R.C. 1939?

3. Are expenditures by Arc, Arcadia, and Lydiade in 1954 to Peat, Marwick, Mitchell & Company for accountant fees deductible as ordinary and necessary business expenses under section 162(a)(1), I.R.C. 1954?

4. Are Arc, Arcadia, and Lydiade entitled to deduct from net income in the computation of their subchapter A net income for

1951, 1952, and 1953 Federal income taxes paid during said years though accrued and deducted in prior years?

5. Are petitioners Arc, Arcadia, and Lydiade entitled to unused dividend paid credit carryovers from prior years in the computation of their personal holding company surtax liability and of the personal holding company tax portion of their income tax liabilities for the years 1951 through 1954?

6. May petitioner Arc in Docket No. 70296 deduct the amount of $5,869.50 in computing its personal holding company tax under the alternative method?

7. Is Lydiade entitled to an overpayment in income tax for the year 1953?

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Petitioners Arc Realty Company, Arcadia Realty Company, and Lydiade Investment Trust, hereinafter referred to as Arc, Arcadia, and Lydiade, respectively, are corporations organized under the laws of Missouri on October 16, 1898, June 16, 1895, and March 15, 1930, respectively, with offices at St. Louis, Missouri.

Petitioners filed their Federal income tax returns and personal holding company surtax returns for the years 1951, 1952, and 1953 at St. Louis, Missouri, with the respective offices of the collector of internal revenue for the first district of Missouri, the director of internal revenue, and the district director of internal revenue. Their income tax returns, including computations for personal holding company tax, for the year 1954 were filed with the district director of internal revenue at St. Louis, Missouri. All returns were filed on a cash basis.

Arc, Arcadia, and Lydiade were personal holding companies during each of the years 1951 to 1954, inclusive.

*Basis of stock.*—In 1932 the American Press owned a daily newspaper known as The St. Louis Times. On March 1, 1932, the American Press executed a series of 5 per cent gold notes aggregating $1,250,000, which were secured by a first mortgage deed of trust on its physical assets. On June 21, 1932, petitioners held certain of said secured notes with total face values as follows: Arc, $180,000; Arcadia, $125,000; and Lydiade, $100,000. On the last-mentioned date the American Press entered into a purchase and sale agreement with the Star-Chronicle Publishing Company, predecessor of Star-Times Publishing Company (both hereinafter referred to as Star), under which the American Press contracted to sell to Star all the assets of The St. Louis Times (except cash, accrued accounts receivable, notes, securities, collaterals, and choses in action) for

5,000 shares of Star 4 per cent second preferred stock to be issued and delivered on or before July 1, 1934. The pertinent provisions of the agreement (sections 5, 14, and 15 of article Fifth) are as follows:

5. That Seller shall furnish to Buyer, within thirty (30) days, satisfactory evidence that its stockholders have ratified and approved this contract, at a legal meeting regularly called and held, by an affirmative vote of the holders of at least three-fourths (¾ths) of its capital stock, and within sixty (60) days will furnish satisfactory evidence that all who have or claim any interest in or lien on or against said newspaper or in any of the property, equipment, assets, or rights covered by this contract, have released same and that all of said property is free and clear of all such claims and liens, except the mortgage deed of trust given by Seller, on or about March 1, 1932, to secure five percent. (5%) gold notes, aggregating one million, two hundred and fifty thousand ($1,250,000.00) dollars, which said mortgage deed of trust * * * together with all notes secured thereby, shall be pledged with Purchaser by G. A. Buder, and/or others, as hereinafter provided.

\*       \*       \*       \*       \*       \*       \*

14. That the consideration, or purchase price, to be given by Purchaser to Seller for said newspaper and for all of the property, equipment, assets, and rights covered by this contract and for full performance of and complete compliance with all of the terms, provisions, and conditions of this contract, shall be and consist of five thousand (5,000) shares of second preferred capital stock of Purchaser, having a par value of one hundred ($100.00) dollars each, or a total par value of five hundred thousand ($500,000.00) dollars which said stock shall be dated July 1, 1934 and shall be finally issued and delivered to Seller, or to its assigns, on or before July 1, 1934. Purchaser shall forthwith cause its stockholders, at a meeting regularly called and held, to ratify this contract and to amend its Articles of Agreement, so as to change the provisions thereof * * *, to authorize the increase of its capital stock and the issuance of the second preferred stock above mentioned * * *

15. That Purchaser shall issue and deliver to Seller, assignable interim certificates, entitling Seller, or its assigns, to said second preferred stock on July 1, 1934, if this contract has been fully complied with and carried out by Seller. * * * All of said interim certificates shall be deposited and left with the Mercantile-Commerce Bank & Trust Company in escrow, until Seller shall have produced satisfactory evidence that this contract and the sale of said newspaper and assets have been ratified and approved by the Board of Directors of Seller and by the stockholders of Seller at a stockholders meeting regularly called and held, by an affirmative vote of the holders of at least three-fourths (¾ths) of the capital stock of Seller, and also until Seller has produced evidence, satisfactory to Purchaser, that all liens, encumbrances and claims of interest in or of liens on or against said newspaper and/or any of the property or assets above mentioned, have been duly settled and released, so that the property covered by this contract, conveyed, transferred, assigned, and delivered to Purchaser, shall be free and clear of all liens, encumbrances and claims of every kind whatsoever, except the mortgage deed of trust given by Seller on or about March 1, 1932, which * * *, together with the notes secured thereby is being pledged as collateral security for the guaranty of G. A. Buder * * *. As soon as Seller has transferred, assigned, and delivered to Purchaser all of the property, equipment, assets, and rights covered by this contract, and has produced satisfactory evidence of authority to make said transfers and assignments and also evidence that all of said property so transferred and assigned

is free and clear of all liens, encumbrances and claims, as provided for in this contract, then Purchaser shall release to Seller, or to Seller's order, the interim certificates above mentioned. The Mercantile-Commerce Bank & Trust Company shall not be required to surrender said interim certificates except on the order of both Seller and Purchaser.

On June 24, 1932, petitioners surrendered the 5 per cent gold notes issued by the American Press and received in exchange interim certificates for the following numbers of shares of 4 per cent second preferred stock of Star: Arc, 630 shares; Arcadia, 437½ shares; and Lydiade, 350 shares. These interim certificates were held in escrow until July 1934.

On June 25, 1932, a meeting of the stockholders of Star was held for the purpose, *inter alia*, of amending its articles of agreement so as to comply with the purchase and sales agreement of June 21, 1932. As amended, article Third provided in pertinent part as follows:

THIRD. The capital stock of this corporation, on and after July 1, 1934, shall consist of the following classes and amounts of stock: * * * (3) Five Thousand (5,000) shares of second preferred capital stock having a par value of One Hundred ($100.00) Dollars per share, or a total of Five Hundred Thousand ($500,000.00) Dollars. * * * That all (100%) of said increase in the said capital stock, consisting of five thousand (5,000) shares of second preferred stock having a par value of One Hundred ($100.00) Dollars per share, has been subscribed for by The American Press, for itself or its assignees or nominees, and has been paid up with property purchased by the Company from The American Press, under and in accordance with a Purchase and Sales Agreement, dated June 21, 1932, which said property has already been transferred and delivered to the Company and is now in the possession of the Board of Directors of the Company * * *. In exchange for said property, the Company is issuing its Interim Certificates to the American Press, certifying that it, its nominees or assignees, will, on july [*sic*] 1, 1934, be entitled to receive the said five thousand (5,000) shares of second preferred stock of the Company. * * *

The assets of The St. Louis Times which were transferred to Star were enumerated both in the purchase and sales agreement of June 21, 1932, and in the stockholders meeting of Star on June 25, 1932, as having an aggregate value of $626,765.18.

On July 2, 1934, Star issued stock certificates for 4 per cent second preferred stock to petitioners in amounts equal to the number of interim certificates held by each.

On June 24, 1932, G. A. Buder, an officer and principal shareholder in Arc, Arcadia, and Lydiade, individually exchanged $175,-000 of American Press 5 per cent gold notes for interim certificates for 875 shares of 4 per cent second preferred stock of Star. Between 1932 and 1934 Buder transferred interim certificates for 1,104 shares of 4 per cent second preferred stock of Star to Lydiade as a contribution to capital, 850 of which were a part of the 875 which he had acquired on June 24, 1932. On July 2, 1934, 1,104 shares of

4 per cent second preferred stock of Star were issued to Lydiade in addition to the 350 shares mentioned above.

During the years 1935 and 1936, Lydiade purchased 19 shares of 4 per cent second preferred stock of Star for $680.

Parsons and Whittemore, Inc., in June 1932, was a creditor of the American Press in the sum of $34,518.28, for newsprint sold to it, said indebtedness being evidenced by three promissory notes. On September 27, 1932, Parsons and Whittemore, Inc., surrendered said promissory notes in exchange for interim certificates for 323 shares of the 4 per cent second preferred stock of Star.

On October 25, 1937, Elzey Roberts, a principal shareholder and officer of Star during the period from 1928 to 1951, purchased 200 shares of the above-mentioned 323 shares of 4 per cent second preferred stock of Star at $40 per share from Parsons and Whittemore, Inc., which were part of the shares issued for the interim certificates.

On June 6, 1941, Elzey Roberts sold 100 shares of 4 per cent second preferred stock of Star to G. A. Buder for $40 per share, and on April 14, 1944, Elzey Roberts sold 100 shares to G. A. Buder for $40 per share.

During the years 1936 through 1951, with the exception of the year 1939, Star declared and paid cash dividends on its 4 per cent second preferred stock in amounts varying from $1 to $2 semiannually. Star never paid stock dividends on its second preferred stock.

Pursuant to a call for the shares of 4 per cent second preferred stock of Star for redemption subsequent to a sale of the entire business of Star during the year 1951, each of the petitioners received the following amounts for the sale of the respective number of shares:

| Petitioner | Number of shares | Amount received |
|------------|------------------|-----------------|
| Arc | 630 | $63,000 |
| Arcadia | 437½ | 43,750 |
| Lydiade | 1,473 | 147,300 |

On their income tax returns for the year 1951 petitioners reported the basis of Star 4 per cent second preferred stock to be $100 per share, and that, therefore, they realized no gain or loss from its sale.

*Christmas gifts.*—During the years 1951 and 1952 Arc owned 392 shares of the 1,000 shares of stock outstanding of Commerce-Warren County Bank, hereinafter referred to as Commerce, a banking corporation operating in Warrenton, Missouri. During the year 1952 Lydiade owned 218 shares of Commerce and also maintained a checking account there. During said years both Arc and Lydiade received dividends on their shares of Commerce stock.

During the years 1951 and 1952 Arc made Christmas gifts in the amounts of $300 and $200, respectively, to Otto Eisenstein, president of Commerce, and deducted these gifts as business expenses on its

income tax returns for said years. Lydiade made a Christmas gift to Eisenstein in the amount of $100 in the year 1952 and deducted said amount as a business expense on its income tax returns for the year 1952.

*Accountant's fees.*—During the year 1954 Arc, Arcadia, and Lydiade paid $600, $2,190, and $500, respectively, to the public accounting firm of Peat, Marwick, Mitchell & Company for services and deducted the expenditures on their income tax returns for the year 1954.

Peat, Marwick, Mitchell & Company examined petitioners' books and records, which reflected transactions between petitioners and G. A. Buder, and compiled statements of account for the petitioners to file against the estate of G. A. Buder, deceased.

*Deduction of Federal taxes.*—Petitioners claimed the following deductions for Federal income taxes accrued and paid on their personal holding company surtax returns (Form 1120H):

|  | Arc | Arcadia | Lydiade |
|---|---|---|---|
| Deduction for Federal income taxes claimed on 1951 personal holding company surtax return: | | | |
| 1950 income tax paid in 1951 | $2,700.37 | $647.79 | $860.26 |
| 1951 income tax accrued but not paid in 1951 | 3,667.25 | 4,935.12 | 1,062.39 |
| Total | 6,367.62 | 5,582.91 | 1,992.65 |
| Deduction for Federal income taxes claimed on 1952 personal holding company surtax return: | | | |
| 1951 income tax paid in 1952 | 3,667.25 | 4,935.12 | 1,062.39 |
| 1952 income tax accrued but not paid in 1952 | 2,876.52 | 6,992.22 | 639.73 |
| Total | 6,543.77 | 11,927.34 | 1,702.12 |
| Deduction for Federal income taxes claimed on 1953 personal holding company surtax returns: | | | |
| 1952 income tax paid in 1953 | 2,876.52 | 6,992.52 | ------------ |
| 1953 income tax accrued but not paid in 1953 | 5,095.66 | 1,648.87 | ------------ |
| Total | 7,972.18 | 8,641.39 | ------------ |

Petitioners further claimed as deductions on their personal holding company surtax returns (Form 1120H) payments of deficiencies in Federal income taxes allowed by respondent as deductions in prior years as follows:

|  | Arc | Arcadia |
|---|---|---|
| 1952 personal holding company surtax return: 1945, 1946 deficiencies in income tax allowed by respondent as deductions in computing 1945, 1946 personal holding company surtax, but not paid by petitioner until 1952 | -------- | $1,119.47 |
| 1953 personal holding company surtax returns: 1947, 1948 deficiencies in income tax allowed by respondent as deductions in computing 1947, 1948 personal holding company surtax, but not paid by petitioners until 1953 | $461.15 | 360.56 |
| 1949, 1950 deficiencies in income tax allowed by respondent as deductions in computing 1949, 1950 personal holding company surtax, but not paid by petitioner until 1953 | 23.08 | -------- |

*Unused dividends paid credit carryovers.*—Petitioners claimed carryovers of unused dividends paid credits from prior years on their Federal personal holding company surtax returns (and computation of the personal holding company tax portion of income tax for the taxable year 1954) as follows:

| Petitioner | Year claimed | Year from which dividend paid credit is carried over | Amount carried over |
|---|---|---|---|
| Arc | 1951 | 1950 | $44.39 |
| Arc | 1952 | 1951 | 3,746.24 |
| Arc | 1953 | 1952 | 4,278.67 |
| Arc | 1954 | 1953 | 340.98 |
| Arcadia | 1953 | 1952 | 7,515.38 |
| Lydiade | 1951 | 1950 | 5,150.14 |
| Lydiade | 1952 | 1951 | 1,096.24 |

OPINION.

*Basis of stock.*—The material facts pertinent to the primary issue are without dispute. As of June 21, 1932, petitioners owned 5 per cent gold notes issued by the American Press with face values aggregating $405,000. The cost of these notes to the petitioners is not shown. On June 24, 1932, petitioners exchanged the notes for interim certificates for 1,417½ shares of Star 4 per cent second preferred stock. Between 1932 and 1934 G. A. Buder contributed interim certificates for 1,104 shares of Star 4 per cent second preferred stock to the capital of petitioner Lydiade. On July 2, 1934, petitioners received 2,521½ shares of Star 4 per cent second preferred stock in exchange for their interim certificates. During 1935 and 1936 Lydiade purchased 19 shares of Star 4 per cent second preferred stock for a total consideration of $680. During the taxable year 1951 petitioners sold their aggregate of 2,540½ shares of Star 4 per cent second preferred stock for $100 per share.

On their returns petitioners reported their basis for the said 2,540½ shares as $100 per share and, consequently, they maintain that no gain resulted from the 1951 sales. In support thereof petitioners contend that as of the date of their acquisition in June 1932 the interim certificates had no fair market value and that, therefore, their basis must be determined by the amount petitioners had invested in the secured notes of the American Press. But as to this there is no showing. Alternatively, petitioners maintain that if the Star interim certificates are determined to have had a fair market value in June 1932, such value was at least equal to the par value of $100 per share.

Respondent maintains that 2,521½ shares of the 2,540½ shares possessed an ascertainable fair market value as of the date of their

acquisition and has determined the fair market value of 2,521½ shares to be $20 per share.

On brief petitioners concede that the basis of the 19 shares acquired by purchase by Lydiade during 1935 and 1936 is the cost basis. Consequently, we sustain respondent's determination that the basis of these 19 shares is $680, or $35.79 per share. Sec. 113, I.R.C. 1939.

As to the remaining 2,521½ shares [2] the governing principles may be stated as follows. If the interim certificates had an ascertainable fair market value at the time they were received by petitioners in satisfaction of the indebtedness represented by the 5 per cent gold notes of the American Press, then petitioners are considered to have collected the debt evidenced by the face amount of the bonds only to the extent of the fair market value of the stock and the basis of the stock to petitioners thereafter is its fair market value at the time it was initially received. If, however, the interim certificates had no fair market value at the time they were received then it cannot be ascertained how much of the indebtedness was collected by receipt of the stock and the cost basis of the stock to the petitioners is the net amount of the indebtedness ultimately canceled. See *Society Brand Clothes, Inc.*, 18 T.C. 304.

The original acquisition of the Star 4 per cent second preferred stock in issue was in the form of interim certificates which were subject to certain restrictions, primarily those included in section 15, article Fifth, of the purchase and sale agreement, which section is set forth in our Findings of Fact. Petitioners' position is that as a result of such restrictions said interim certificates were not marketable and had no fair market value, citing as authority for this contention *Helvering* v. *Tex-Penn Co.*, 300 U.S. 481 (1937); *MacDonald* v. *Commissioner*, 230 F. 2d 534 (C.A. 7, 1956), reversing 23 T.C. 227; *Propper* v. *Commissioner*, 89 F. 2d 617 (C.A. 2, 1937), reversing 33 B.T.A. 261.

Petitioners rely heavily on the following statement by the Supreme Court in *Helvering* v. *Tex-Penn Co.*, *supra* at 499:

The court is also of the opinion that the judgments must be affirmed upon the ground that in the peculiar circumstances of this case, the shares of Trans-

---

[2] Of these interim certificates for 2,521½ shares, 1,417½ were acquired by petitioners upon original issuance on June 24, 1932, in exchange for their American Press 5 per cent gold notes. Interim certificates for 1,104 shares were acquired between 1932 and 1934 by petitioner Lydiade as a contribution to capital from G. A. Buder; of these 1,104, 850 had been acquired by G. A. Buder upon original issuance. Section 113(a)(8)(B), I.R.C. 1939, provides that where property is acquired as a contribution to capital the basis shall be the same as it would be in the hands of the transferor. Petitioners on brief agree that the treatment of the 850 shares is governed by the same rules which control the shares originally issued to the petitioners directly. Since there is no evidence as to the remaining 254 shares, the basis of the entire 1,104 shares contributed will be governed by our treatment of the originally issued shares.

continental stock, regard being had to their highly speculative quality and to the terms of a restrictive agreement making the sale thereof impossible, did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers.

The "peculiar circumstances" which the Supreme Court considered as preventing the stock in that case from having a fair market value, capable of being ascertained with reasonable certainty, on the date acquired, were the "highly speculative quality" of the stock and the terms of a "restrictive agreement" which made "the sale thereof impossible." None of these circumstances are present in the instant case. In fact they are neither duplicated nor even approximated in the case at bar. Cf. *Kline* v. *Commissioner*, 130 F. 2d 742 (C.A. 3, 1942), affirming 44 B.T.A. 1052, certiorari denied 317 U.S. 697. Petitioners do not contend, nor is there any evidence to indicate, that the instant stock was highly speculative in character. Cf. *Heiner* v. *Gwinner*, 114 F. 2d 723 (C.A. 3, 1940), certiorari denied 311 U.S. 714. In fact, the purchase and sale agreement provided for the elimination of an apparent competitor, the American Press, thereby enhancing the profit-making opportunities of Star, the shares of which were acquired by the petitioners.

Since the sale of the instant interim certificates was neither forbidden nor impossible, both *Propper* and *MacDonald* are distinguishable. In *Propper* the shares of stock were subject to a 5-year restriction against sale. No sale could take place during the specified period except with the written consent of the bankers. The taxpayers in that case had originally sought to negotiate the sale of the new corporation stock free from any restrictions, had sought the removal of the restrictions after their imposition, and had failed in their attempts to sell the shares subject to the restrictions or to have them accepted as collateral. In *MacDonald* it was held that a determination of fair market value was precluded by an agreement between taxpayer and his employer corporation which prohibited sale by the taxpayer of stock held in the employer corporation while in that corporation's employ and by the possible liability arising under section 16(b) of the Securities Exchange Act prohibiting short-swing profits. In the instant case, however, the interim certificates are characterized in the purchase and sale agreement as "assignable" and the interim certificate itself contains a blank space for assignment thereof. Moreover, G. A. Buder in fact transferred interim certificates for 1,104 shares to Lydiade between 1932 and 1934. Furthermore, in the instant case there is no prohibition of sale or any evidence of unsuccessful efforts to sell the shares or of any refusal to accept them as collateral. Thus, although restrictions such as those contained in the purchase and sale agreement might

tend to reduce the fair market value, they did not destroy it. See *Trinity Corporation v. Commissioner*, 127 F. 2d 604 (C.A. 5, 1942), affirming 44 B.T.A. 1219; *Heiner v. Gwinner, supra; Kline v. Commissioner, supra*. The stock was not as a matter of law deprived of market value merely because the interim certificates were placed in escrow for 2 years. *Heiner v. Gwinner, supra; Whitney Corporation v. Commissioner*, 105 F. 2d 438 (C.A. 8, 1939), affirming 38 B.T.A. 224. Nor is the additional restriction of section 16(b) of the Securities Exchange Act involved here as it was in the *MacDonald* case.

Respondent determined that the fair market value of the stock in 1932 when petitioners received it in satisfaction of the obligation by Press to them was $20 per share. Petitioners have not met their burden of proving respondent's determination incorrect.

The record indicates that during each of the years 1937, 1941, and 1944 there were sales of Star 4 per cent second preferred stock at $40 per share. The dividend history of the stock in question (semi-annual dividends were paid from 1936 to 1951, with the exception of 1939; no dividends were paid from 1932 to 1935) lends support to the respondent's determination of a market value less than $40 per share. We recognize that evidence of comparable sales closer in time to the transactions questioned would be more satisfactory in ascertaining fair market value. However, petitioners have not introduced such evidence and respondent's determination is deemed presumptively correct.

Petitioners' alternative contention that if the preferred stock is determined to have had a fair market value in June 1932 such value was at least equal to the par value of $100 per share is without merit. The record contains no evidence as to the amount petitioners invested in the 5 per cent gold notes of Press, the date of acquisition, or whether the notes were acquired by gift, purchase, or as a contribution to capital.

The parties stipulated the face value of the gold notes as of June 21, 1932, and the purchase and sale agreement and the minutes of Star's stockholders meeting list the par value of the 4 per cent second preferred stock as $100 per share. However, neither the face value of the notes nor the par value of the interim certificates controls, under the instant circumstances, the determination of the fair market value of the interim certificates in issue.

Accordingly, we sustain respondent's determination that the basis of the 2,521½ shares of Star 4 per cent second preferred stock is $20 per share.

*Christmas gifts.*—Petitioners Arc and Lydiade seek to deduct as

business expenses under section 23(a)(1)(A), I.R.C. 1939,[3] certain payments made in 1951 and 1952, representing Christmas gifts to Otto Eisenstein, president of Commerce-Warren County Bank, in which both Arc and Lydiade held stock and in which Lydiade maintained a checking account.

"Donations made to employees and others, which do not have in them the element of compensation or are in excess of reasonable compensation for services, are not deductible from gross income." Regs. 111, sec. 29.23(a)-8; Regs. 118, sec. 39.23(a)-8. See also *Greenville Textile Supply Co.*, 1 B.T.A. 152. Petitioners have not introduced any evidence to show that the necessary "element of compensation" was present, or that the gifts were, in any way, expenses which were ordinary and necessary to petitioners' trade or business within the meaning of section 23(a)(1)(A). *Welch* v. *Helvering*, 290 U.S. 111. Accordingly, respondent's disallowance of petitioners' deductions for gifts to Eisenstein is upheld.

*Accountant's fees.*—Petitioners Arc, Arcadia, and Lydiade contend that the amounts of $600, $2,190, and $500, respectively, which they paid in 1954 to the public accounting firm of Peat, Marwick, Mitchell & Company for services are deductible as business expenses under section 162(a)(1), I.R.C. 1954 (which section is substantially the same as section 23(a)(1)(A), I.R.C. 1939, quoted in footnote 3).

The record indicates that Peat, Marwick, Mitchell & Company examined petitioners' books and records, which reflected transactions between petitioners and G. A. Buder, an officer and principal shareholder of petitioner corporations from 1934 to 1951, in order to prepare a statement of account for petitioners to file against the estate of G. A. Buder, deceased.

Although the precise nature of these transactions is not clear, they apparently were numerous and diverse and extended over a period of many years. Petitioners' witness, an accountant associated with Peat, Marwick, Mitchell & Company, testified that their accounting work indicated that G. A. Buder "was indebted to these companies in substantial amounts." This testimony stands uncontroverted and there is no reason to disbelieve it.

The complexities of corporate business transactions often require the professional services of men skilled in accounting procedure and practice. Accountant fees incurred in the preparation of a

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as *deductions*:
(a) EXPENSES.—
    (1) TRADE OR BUSINESS EXPENSES.—
        (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personel services actually rendered * * *

claim to be filed in an accounting of the estate of a former officer of claimant corporations constitute, under the instant circumstances, an expense ordinary, necessary, and reasonably related to the carrying on of petitioners' trade or business. On this issue respondent's determination is not sustained.

*Deduction of Federal taxes.*—Petitioners Arc, Arcadia, and Lydiade further contend that in the computation of subchapter A net income for the taxable years 1951, 1952, and 1953 they were entitled to deduct Federal income taxes paid during said years, though accrued and deducted in prior years, as well as Federal income taxes accrued during said years but paid in subsequent years.

Respondent, in his deficiency notices, disallowed those Federal income taxes paid during the years in issue which had been accrued and deducted in prior years in the following amounts:

| Petitioner | Year | Deduction claimed |
|---|---|---|
| Arc Realty Co. | 1951 | $2,700.37 |
| Arc Realty Co. | 1952 | 3,667.25 |
| Arcadia Realty Co. | 1951 | 647.79 |
| Arcadia Realty Co. | 1952 | 6,054.59 |
| Lydiade Investment Trust | 1951 | 860.26 |
| Lydiade Investment Trust | 1952 | 1,062.39 |
| Arc Realty Co. | 1953 | 3,360.75 |
| Arcadia Realty Co. | 1953 | 7,353.08 |

Respondent disallowed the amounts claimed as deductions in the years when paid for the reason that each of such amounts had already been allowed to petitioners in prior taxable years as deductions for accrued Federal income taxes. Thus, the amounts disallowed by respondent represent double deductions claimed by petitioners for Federal income taxes in the computation of their personal holding company surtax.

Subchapter A is that part of chapter 2 (Additional Income Taxes) of the 1939 Code which (in addition to the taxes imposed by chapter 1) imposes a surtax upon the undistributed subchapter A net income of every personal holding company. Section 505(a)(1) provides as follows:

SEC. 505. SUBCHAPTER A NET INCOME.

For the purposes of this subchapter the term "Subchapter A Net Income" means the net income with the following adjustments:

(a) ADDITIONAL DEDUCTIONS.—There shall be allowed as deductions—

(1) Federal income, war-profits, and excess-profits taxes *paid or accrued* during the taxable year to the extent not allowed as a deduction under section 23; but not including the tax imposed by section 102, section 500, or a section of a prior income-tax law corresponding to either of such sections. [Emphasis supplied.]

The question whether, for purposes of determining personal holding company tax under section 505(a)(1) of the Internal Revenue Code of 1939, a cash basis taxpayer may deduct the amount of in-

come tax liability in the year paid or in the year in respect of which the income tax liability was incurred, has been before this and other courts in numerous cases, with varying results. *M. W. Alworth*, 38 B.T.A. 656; *Clarion Oil Co.*, 1 T.C. 751, revd. 148 F. 2d 671 (C.A. D.C., 1945), certiorari denied 325 U.S. 881; *Aramo-Stiftung* v. *Commissioner*, 172 F. 2d 896 (C.A. 2, 1949), reversing on this point 9 T.C. 947; *Joan Carol Corporation* v. *Commissioner*, 180 F. 2d 751 (C.A. 2, 1950), reversing 13 T.C. 83; *Birmingham* v. *Loetscher Co.*, 188 F. 2d 78 (C.A. 8, 1951); *Wm. J. Lemp Brewing Co.*, 18 T.C. 586 (wherein the Tax Court reexamined its previous position and decided to follow the Courts of Appeals decisions in the foregoing cases); *DeSoto Securities Co.*, 25 T.C. 175, revd. 235 F. 2d 409 (C.A. 7, 1956); *Mills, Inc.*, 27 T.C. 635, revd. 250 F. 2d 55 (C.A. 1, 1957); *Patten Fine Papers, Inc.*, 27 T.C. 772, reversed in part 249 F. 2d 776 (C.A. 7, 1957). None of these cases, however, involved the question of double deduction such as the petitioners in the instant case seek to obtain, that is, the right, for personal holding company tax purposes, to deduct the amount of income tax liability both in the year incurred and in the year paid. Accordingly, we deem it unnecessary to discuss those cases at length. It might, however, be pointed out that both years were before the Court in the *Patten Fine Papers, Inc.* case and the Court of Appeals held that the Tax Court erred in its determination that, for personal holding company tax purposes, the income tax liability was deductible in 1949, the year incurred, rather than 1950, the year paid. It would seem to follow that though a deduction for each of said years was not specifically claimed in that case, the Court of Appeals did not consider the deduction allowable in both years. We think it obvious a double deduction was not intended by this statute. Accordingly, respondent's determination disallowing the deduction of Federal income taxes in the year paid where such taxes had been incurred, accrued, and deducted in prior years, is sustained.

*Unused dividends paid credit carryovers.*—In their petitions petitioners have challenged respondent's disallowance of certain alleged unused dividend credit carryovers from prior taxable years in the computation of their personal holding company surtax liabilities (and of the personal holding company portion of petitioner Arc's income tax liability for the taxable year 1954).

In *Delaware Realty & Inv. Co.* v. *Commissioner*, 234 F. 2d 911 (C.A. 3, 1956), affirming on this ground, reversing on other grounds, 25 T.C. 51, the Court of Appeals for the Third Circuit pointed out at page 914 that:

Section 504 of the 1939 Code, 26 U.S.C., 1952 ed. § 504, by express incorporation of provisions of Section 27, 26 U.S.C., 1952 ed. § 27, defines the permitted

carryover dividend credit as simply the difference between the dividend paid by the corporate taxpayer in the first preceding year and its Subchapter A net income for that year.

As his notices of deficiency indicate, respondent computed petitioners' allowable dividend paid credits and personal holding company surtax liabilities in accordance with the method approved in *Delaware Realty & Inv. Co.*, *supra*, and disallowed the unused dividend credit carryovers from prior taxable years because the dividend paid credits for the prior taxable years did not exceed the subchapter A net income for those years.

On brief, petitioners, in their statement of the facts, state: "As this is solely a matter of computation, which depends upon other questions presented for determination, the application of the law (Section 504, I.R.C.) should suffice." Respondent, on reply brief, apparently agrees with this statement.

In view of our disposition of the other issues, respondent's determination as to the "unused dividend credit carryover" issue is sustained. Insofar as the claimed dividend credit carryovers from all years except the year 1950 are concerned, the dividends paid in said years did not exceed the subchapter A net income of the respective petitioners for those years. With respect to the carryovers claimed by petitioners Arc and Lydiade from the year 1950 no evidence has been introduced to indicate that the dividends paid in that year exceeded the subchapter A net income for the same year and consequently petitioners have not overcome the presumptive correctness of respondent's determination disallowing the carryovers from that year. Accordingly, respondent's disallowance of the alleged unused dividend credit carryovers for each of the years 1951, 1952, 1953, and 1954, in which they were claimed, is sustained.

*Computation of Alternative Tax.*—On brief petitioners contend that in computing the tax liability of petitioners in Docket Nos. 64689, 64690, 64691, and 70296, "respondent has computed the alternative tax required by Section 117(c) [4] of the Internal Revenue Code,

---

[4] SEC. 117. CAPITAL GAINS AND LOSSES.

(c) ALTERNATIVE TAXES.—

(1) CORPORATIONS.—If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, there shall be levied, collected, and paid, in lieu of the tax imposed by sections 13, 14, 15, 204, 207(a)(1) or (3), 421 and 500, a tax determined as follows, if and only if such tax is less than the tax imposed by such sections:

(A) A partial tax shall first be computed upon the net income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted.

(B) There shall then be ascertained an amount equal to 25 per centum of such excess, except that in the case of any taxable year beginning after March 31, 1951, and before April 1, 1954, there shall be ascertained an amount equal to 26 per centum of such excess.

(C) The total tax shall be the partial tax computed under subparagraph (A) plus the amount computed under subparagraph (B).

but has also computed and added thereto a surtax liability under Section 500 of the Internal Revenue Code." They maintain that "[t]he alternative tax computed under Section 117(c) of the Internal Revenue Code is a distinct single tax in substitution for all other income taxes and precludes any surtax under Section 500[5] of the Internal Revenue Code," and rely as authority for this proposition on *Delaware Realty & Inv. Co. v. Commissioner, supra.*

Respondent's concessions on brief dispose of the section 117(c) alternative tax computation issue as to the petitioners in Docket Nos. 64689, 64690, and 64691. Respondent has, however, made no concession as to such an issue in Docket No. 70296, contending that, unlike petitioners in Docket Nos. 64689, 64690, and 64691, the petitioner in Docket No. 70296 did not contest in its petition respondent's tax computation under section 117(c). Respondent's position is that the correctness of respondent's computation in Docket No. 70296 is not properly before this Court, and, alternatively, even if it is, respondent contends that the computation in this docket number is correct.

In its amended petition, petitioner in Docket No. 70296 alleged that respondent erred in determining—

(m) That although the amount of the capital gains tax for the year 1953 in the sum of $5,869.50 was included in computing the total personal holding company surtax for such year, only $2,673.63 of such amount should be allowed in computing the alleged personal holding company alternative tax for the same year.

This allegation of error relates to respondent's alternative tax computation under section 117(c) insofar as it concerns the amount deductible as the "Portion of income tax under Chapter 1 attributable to revised long-term capital gain."

Respondent's computation [6] in his deficiency notice in Docket No. 70296 follows the method approved by us in *Clarence Co.,* 21 T.C. 615. The portion of the income tax attributable to excess

---

5 SEC. 500. SURTAX ON PERSONAL HOLDING COMPANIES.

There shall be levied, collected, and paid, for each taxable year beginning after December 31, 1938, upon the undistributed subchapter A net income of every personal holding company (in addition to the taxes imposed by chapter 1) a surtax equal to the sum of the following:

    (1) 75 per centum of the amount thereof not in excess of $2,000, plus
    (2) 85 per centum of the amount thereof in excess of $2,000.

| | |
|---|---:|
| 6 Subchapter A net income as adjusted | $37,321.44 |
|     Less: Federal income tax | 4,089.46 |
| Subchapter A net income as revised | $33,231.98 |
|     Less: Dividend paid credit | 3,500.00 |
| Undistributed Subchapter A net income | $29,731.98 |
|     Less: Revised net long-term capital gain | 22,575.00 |
| Excess undistributed Subchapter A net income | $7,156.98 |

Footnote continued on following page.

long-term gains is arrived at by obtaining that percentage of the income tax which excess long-term gains bear to subchapter A net income. This formula type computation approved in *Clarence Co.*, *supra*, and used here prevents the imposition of a total effective tax rate on long-term capital gains in excess of the applicable rate under section 117(c)(1)(B) (26 per cent for the taxable year 1953).

On brief petitioners contend that respondent imposed a tax under section 500 in addition to the alternative tax under section 117(c). The purport of petitioners' contention is not easily discernible. Petitioners have not attempted to explain their contention or to show its applicability to petitioner in Docket No. 70296, beyond citing *Delaware Realty & Inv. Co.*, *supra*, as authority.

Therefore, in answer to petitioners' contentions on brief, we need merely state that respondent's computation in his notice of deficiency in Docket No. 70296 followed the express statutory language of section 117(c). Section 117(c)(1)(A) requires that a "partial tax" be first computed upon the net income reduced by excess long-term capital gains at the rates and in the manner as if section 117(c) had not been enacted. Under the instant facts the "partial tax" is computed at the rates and in the manner prescribed by sections 13, 15, and 500. The second element of the alternative tax requires that an amount equal to 26 per cent of the excess long-term capital gains be imposed for the taxable year 1953. In order to prevent a tax rate in long-term capital gains in excess of the 26 per cent imposed by section 117(c)(1)(B) respondent has allowed a deduction for that portion of income tax under chapter 1 attributable to long-term capital gains.

Petitioners' reliance on *Delaware Realty & Inv. Co.*, *supra*, is misplaced. That case involved the deductibility of the alternative tax of a prior year in computing the undistributed subchapter A net income of the year in which said alternative tax was paid. That case did not involve the portion of income tax attributable to long-term capital gains. Furthermore, in that case taxpayer's net income did not exceed its excess capital gains. Thus there was no item of liability under section 117 assessed at section 500 rates. Petitioner in

Footnote continued from preceding page.

| | | |
|---|---|---|
| Surtax on first $2,000.00 at 75% | $1,500.00 | |
| Surtax on remaining $5,156.98 at 85% | 4,383.43 | $5,883.43 |
| Partial tax (25% [*sic*] [1] x $22,575.00) | | 5,860.50 |
| Total | | $11,752.93 |
| Less: Portion of income tax under Chapter 1 attributable to revised long-term capital gain ($22,575.00/$37,321.44 x $4,089.46) | | 2,473.63 |
| Alternative tax | | $9,279.30 |

[1] Applicable rate for the taxable year 1953 is 26 per cent. Sec. 117(c)(1)(B).

Docket No. 70296, unlike the taxpayer in *Delaware Realty & Inv. Co., supra,* had net income in excess of capital gains upon which the partial tax must be computed. Consequently, petitioners' contention as to a section 500 tax being imposed, in addition to the section 117(c) alternative tax, is without merit. Accordingly, respondent's computation of the section 117(c) alternative tax is approved.

*Overpayment by Lydiade in 1953.*—In its amended petition Lydiade claims a refund of an overpayment in income tax of $3,320.63 for the year 1953, a year in which the respondent did not determine a deficiency for either personal holding company surtax or income tax. Although it is proper to consider the year 1953 to the extent that it will affect the taxability for the subsequent year, 1954, in which respondent did determine a deficiency, we have no jurisdiction to determine an overpayment by Lydiade in the year 1953. Sec. 272(g), I.R.C. 1939.

*Decisions will be entered under Rule 50.*