WILLARD M. BOLLENBACH, SR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ALICE J. BOLLENBACH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bollenbach v. Commissioner
Docket Nos. 2110-72 and 2111-72.
United States Tax Court
T.C. Memo 1974-270; 1974 Tax Ct. Memo LEXIS 48; 33 T.C.M. (CCH) 1216; T.C.M. (RIA) 740270; October 15, 1974, Filed. John L. Hannaford, Bruce E. Hanson, and Burton G. Ross, for the petitioners. Lawrence B. Gibbs, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' gift taxes for the following calendar years in the amounts indicated: Deficiencies Year
Willard M. Bollenbach, Sr. Docket No. 2110-72
Alice J. Bollenbach Docket No. 2111-72 1962
$ 67.50
$ 67.50
1963
1,237.50
1,237.50
1964
49,402.06
154,741.98
1965
4,320.00
4,725.00
1966
23,760.00
27,445.50
The sole issue for decision is the fair market value of stock in Bollenbach Investment Company, a personal holding company, at the date of each gift. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Willard *49 M. Bollenbach, Sr., and Alice J. Bollenbach, husband and wife, resided in St. Paul, Minnesota at the time of the filing of the petitions in these cases. Petitioners filed separate Federal gift tax returns for the calendar year 1964 on April 16, 1965, with the district director of internal revenue at St. Paul, Minnesota. On February 24, 1969, petitioners filed separate Federal gift tax returns for the calendar years 1962, 1963, 1965, and 1966 with the district director of internal revenue at St. Paul, Minnesota. During the years 1962 through 1966, petitioners made the following gifts of special common shares of Bollenbach Investment Company (hereinafter BIC) stock to their children and grandchildren, the value per share of which was shown on their gift tax return for the year of the gift as follows: Date of gift
Willard M. Bollenbach, Sr.
Alice J. Bollenbach
Reported per share value Dec. 29, 1962
20
20
$130.76
Dec. 29, 1963
90
90
161.72
Dec. 29 and 31, 1964
299
818
133.375
Dec. 31, 1965
20
20
170.00
Jan. 3, 1966 [1]
90
90
170.00
*50 For 1961 (a year not here in issue) petitioners filed separate gift tax returns each reporting a gift of 110 common shares of BIC stock valued at $300 per share. BIC was incorporated in Minnesota on November 7, 1961, and at all times was a personal holding company. BIC's articles of incorporation provided for total authorized capital stock of 25,000 common shares of $1.00 par value. Shortly after its incorporation, petitioners and their son transferred to BIC a total of 263 class A common shares of Edward E. Johnson, Inc. (hereinafter Johnson, Inc.) in exchange for 2,630 shares of BIC which were held as follows: Class A common shares of Johnson Inc. transferred
Bollenbach shares received Willard M. Bollenbach, Sr.
75
750
Alice J. Bollenbach
126
1,260
Willard M. Bollenbach, Jr.
62
620
Total
2,630
Willard M. Bollenbach, Sr., was elected president and treasurer of BIC, Willard M. Bollenbach, Jr., was elected vice president, and Wilfred E. Rumble was elected secretary. These three men constituted the board of directors of BIC. Article V of BIC's articles of incorporation was amended on December 14, 1962, to create two classes of *51 authorized capital stock, of which 49 shares held by Willard M. Bollenbach, Jr., were common shares and the remaining 2,581 shares were designated "special common" shares. The amendment provided as follows with respect to the two classes of stock: The Common Shares and the Special Common Shares shall be identical in all respects except that the Special Common Shares shall be entitled to vote on a parity, share for share, with the Common Shares, only on any amendment of this Article V or on any proposal to merge or consolidate this corporation with any other corporation, to liquidate or dissolve it or to sell all, or substantially all, of the assets of this corporation, and not, except as hereinafter provided, on any other matters affecting the corporation, including the election of Directors. None of the Common Shares authorized hereby may be sold or transferred (other than a transfer by gift or bequest to a descendant of a holder of record of Common Shares) in any manner which does not include a valid and enforceable offer by a solvent and responsible party to purchase all of the then outstanding Special Common Shares on the same terms and conditions (but not less than net worth *52 determined in accordance with good and accepted accounting practices which will include valuing the assets of the corporation at fair market value if the book value of any thereof shall be less than such fair market value) as the terms and conditions on which the Common Shares are proposed to be sold or transferred. In the event of any sale or transfer of Common Shares, or attempt to sell or transfer any of such shares contrary to the foregoing restriction and without the written consent of all holders of Special Common Shares, or, in the event of the death of the survivor of the holders of record of the Common Shares leaving no descendants surviving them, the Special Common Shares shall, without further action of the corporation or the holders of such Special Common Shares, become entitled thereafter to vote on all matters affecting the corporation on a parity, share for share, with the Common Shares. Willard M. Bollenbach, Jr. owned all 49 common shares of BIC until July 5, 1966, when Article V of the articles of incorporation was amended for the second time to provide that all BIC stock should once again become Common Shares of the par value of $1.00 per share. The only income *53 of BIC during the years 1962 through 1965 was dividend income received from Johnson, Inc., most of which was distributed to the shareholders of BIC. Johnson, Inc., a Minnesota corporation, was at all times since its incorporation on January 1, 1917, a closely held manufacturing corporation. The company was founded in March 1904 by Edward E. Johnson (hereinafter Johnson) who conducted the business as a sole proprietorship until 1917. The corporation's principal business was the fabrication and sale of intake screens for residential, industrial and municipal water wells, drive points, de-watering well points, filters and screen panels for water treatment, chemical process, food processing and other industries. Johnson, Inc., had a number of competitors in its principal business, a number of which were corporations whose stock was listed on the exchanges. However, all of its competitors also engaged in other business activities. In addition to engaging in the custom design and manufacture of well screens and drive points for a wide range of industrial applications, including the design and building of its own plant machinery for the manufacture of these products, Johnson, Inc. *54 , provided engineering services to its customers as well as consultation services for the World Health Organization and the United States Agency for International Development. As a result of these associations, beginning around 1955 Johnson, Inc.'s employees lectured and conducted classes in various domestic and foreign universities on water sanitation and well construction. From the date of its incorporation until his death in 1937, Johnson was president of the company. After the death of Johnson, Willard M. Bollenbach, Sr. (Willard, Sr.), became president of the company. Willard, Sr., served in this capacity until April of 1965, when he resigned. Upon his resignation he was elected chairman of the board of directors and Willard M. Bollenbach, Jr. (Willard, Jr.), was elected president of the company. He served in this capacity until July of 1966. In 1961, Johnson, Inc., opened a branch operation in New Jersey. In 1955 a decision had been made to form foreign subsidiaries to service the foreign markets. The first step in this direction was the formation of Johnson Screens Proprietary, Ltd., located in Sydney, Australia. This company was dormant during the years 1962 through *55 1966. In 1958, Johnson Well Screens International (hereinafter International) was incorporated under the laws of Liberia. International was a personal holding company, which held 66-2/3 percent of the stock in Canos Filtros Johnson SA, an Argentine company, and 60 percent of the stock in Crepines Johnson France, a French company. The Argentine company had been incorporated on July 16, 1958, and the French company on October 17, 1960. The French and Argentine companies were operating companies during the years 1962 through 1966. On January 27, 1961, the name of International was changed to Johnson Well Screens Overseas, Inc. (hereinafter Overseas), and this company established a branch office in Switzerland. On February 23, 1961, Johnson Well Screens Overseas, SA (hereinafter Overseas, SA), was incorporated in Switzerland. In 1961, Overseas transferred the stock it held in the French and Argentine companies to Overseas, SA, in payment of its $51,000 note held by the Swiss company. Overseas, SA, then became a wholly owned personal holding company, and Overseas was dissolved on May 6, 1963. On October 23, 1962, the board of directors of Johnson, Inc., authorized its president, *56 Willard, Sr., to explore the possibility of establishing a factory in or near Dublin, Ireland. Willard, Sr., gave a favorable report on the situation in Ireland, where he had located a factory building suitable for manufacturing the company's products, inquired as to local financing or government grants to aid in buying the building and machinery, chosen a supervisor to be in charge of the factory, and instructed an attorney to proceed with the forming of a corporation. A decision was tentatively made to authorize capital stock of 10,000 pounds and to issue 1,000 pounds worth at 1 pound par value.Johnson, Inc.'s February 4, 1963, report to its shareholders referred to the formation of a company in Ireland and called it a wholly owned subsidiary. Later, a decision was reached to issue stock in the Irish company (hereinafter Johnson Irish) to 6 stockholders of Johnson, Inc., for additional consideration paid by them, and to operate Johnson Irish as a separate company. Johnson, Inc., loaned money late in 1963 to two shareholders, Lesley Carnes and Eunice Reimer, in return for non-interest-bearing notes, to enable them to purchase their original interest in the Irish corporation. On *57 January 27, 1964, a wholly owned Canadian subsidiary was formed, Johnson Well Screens, Canada, Ltd., (hereinafter Johnson Canada), which was an operating company. At the time of Johnson's death on January 14, 1937, the authorized capital of Johnson, Inc., consisted of 250 shares of 7 percent participating cumulative preferred ($100 par) all owned by his wife, Lillian I. Johnson, who later remarried and became Lillian Lorentzen, and 750 common shares ($100 par) of which Johnson owned 420 shares. Except for 5 shares held by Philip Gilbert, an attorney, the remaining common stock was held by various family members. Following the settlement of Johnson's estate, the 750 common shares were held as follows: Mary F. Johnson (a former wife of Johnson)
125 shares
Alice J. Bollenbach (daughter of Johnson and wife of Willard, Sr.)
125 shares
Lillian D. Kahlert (mother of D. Ward Johnson)
26 shares
Philip Gilbert (attorney)
5 shares
Willard M. Bollenbach, Sr.
75 shares
Lillian Lorentzen
49.37 shares
Lillian Lorentzen for life remainder to Johnson's grandchildren
344.63 shares
Subsequent to the death of Johnson, the articles of incorporation of Johnson, Inc. *58 were amended to change the 750 common shares (par value $100) to 402 class A common shares (par value $100) and 348 class B common shares (par value $100). By the terms of the amendment, the class A common shares elected two directors and the class B common shares elected one director. Common shares in Johnson, Inc., were thereafter held as follows: Shareholder
Shares of class A
Shares of class B Mary F. Johnson
125
Alice J. Bollenbach
125
Lillian D. Kahlert
26
Philip Gilbert
5
Willard M. Bollenbach, Sr.
75
Lillian I. Johnson for life, remainder to Johnson's grandchildren
51
Lillian I. Johnson for life, remainder to Johnson's grandchildren
293.63
Lillian I. Johnson
49.37
Total
402
348.00
Lillian (Johnson) Lorentzen subsequently acquired the 5 class B common shares of Philip Gilbert. Lillian (Johnson) Lorentzen then sold a life estate in the 51 class A common shares to Willard Bollenbach, Sr., for his life. Prior to the incorporation of BIC, Mary F. Johnson died and her 125 class A common shares were thereafter held 62 by her grandson D. Ward Johnson, 62 by Willard Bollenbach, Jr., and 1 by Alice J. Bollenbach. *59 On December 29, 1962, the first date for valuation, the authorized and outstanding stock in Johnson, Inc., was held as follows: Authorized 250 shares 7 percent cum. participating preferred ($100 par)
No. of shares
Total No. of shares Lillian I. Lorentzen
250
Authorized 402 class A common shares ($100 par) Bollenbach Investment Company
263
Willard M. Bollenbach, Sr. (life interest, successor life interest to Lillian Lorentzen and with remainder to Johnson's grandchildren D. Ward Johnson (1/3), Eunice K. Reimer (1/3), Willard, Jr. (1/6), and Lesley B. Carnes (1/6))
51
D. Ward Johnson
62
Lillian D. Kahlert
26 402
Authorized 348 class B common shares ($100 par) Lillian I. Lorentzen
54.37
Lillian I. Lorentzen (life interest with remainder to grandchildren D. Ward Johnson (1/3), Eunice K. Reimer (1/3), Willard Bollenbach, Jr. (1/6), and Lesley B. Carnes (1/6)
293.63
348
Total shares of capital stock issued and outstanding
1,000
Lillian D. Kahlert subsequently gave her 26 class A shares to her son D. Ward Johnson (hereinafter Ward).
From 1954 through 1964, the board of directors of Johnson, Inc. *60 , consisted of Willard, Sr., Lillian (Johnson) Lorentzen, and Wilford L. Rumble (hereinafter Rumble). During the years 1962 through 1965, Lillian (Johnson) Lorentzen was also an executive vice president of Johnson, Inc., and its credit manager. From 1962 Johnson, Inc., was controlled by the three shareholders of BIC. There existed strained relations between these three persons and Ward who wished to have more authority over management of the company. Having determined to take action in this respect, Ward consulted the investment banking firm of Hayden, Stone & Co. in New York to ask advice regarding financial assistance to buy out the other shareholders of Johnson, Inc. In a letter dated December 16, 1963, and signed by Arthur V. Johnson, one of the firm's vice presidents, the firm advised Ward that the contemplated offer to purchase the majority's 80 percent stock ownership for approximately three times book value, or $3.5 to $4 million, seemed to be excessive, and suggested that a more reasonable price would be based on 1.5 to 2 times book value.
The book value referred to did not include the value represented in the company's foreign subsidiaries since the author of the letter *61 considered it "impossible to assign specific "in hand" values to these investments" at that time. Ward, however, in late 1963 or in 1964 offered to purchase all the outstanding stock of Johnson, Inc., and its subsidiaries which he believed included the Irish corporation for $3.75 million which he planned to finance through a public stock sale. There was negotiation with respect to this offer including discussion of the fact that the Irish corporation was not a subsidiary of Johnson, Inc., and would be retained by its shareholders, but finally the offer was not accepted. On August 31, 1964, Johnson, Inc., purchased Ward's 88 class A common shares and his one-third remainder interest in 51 class A common shares and 293.63 class B common shares for the sum of $800,000, for which amount Ward was given a promissory note payable in ten equal annual installments of $80,000 each, commencing on September 1, 1965, with interest on the unpaid balance at the rate of 5 percent per annum. At about the time he sold his stock in Johnson, Inc., Ward sold his interest in the Irish corporation to Willard, Jr. Johnson, Inc., treated the shares of stock it purchased from Ward as treasury stock.
*62 On October 28, 1964, Johnson, Inc., offered to purchase from Eunice Reimer (hereinafter Mrs. Reimer) her one-third remainder interest in 51 class A common shares and 293.63 class B common shares of Johnson, Inc., for the sum of $200,000. With the advice of her attorney, Mrs. Reimer accepted this offer and received $40,000 at the time of closing and a non-interest-bearing promissory note for $160,000 payable in 44 equal monthly installments of $3,636.36 commencing on February 1, 1965. On October 29, 1965, Johnson Irish purchased from Lillian Lorentzen 54.37 class B common shares of Johnson, Inc., for the sum of $146,000 payable in ten equal annual installments with interest at the rate of 5 percent per annum on the unpaid principal balance, the first payment to be made on January 2, 1966. At the same time the Irish corporation purchased from Lillian Lorentzen her successor life estate in 51 shares of class A common and her life estate in 293.63 shares of class B common for $529,000, payable in ten equal annual installments with interest on the unpaid balance at the rate of 5 percent per annum, the first payment to be made on January 2, 1966. The agreement for the purchase of *63 Lillian Lorentzen's interest in the 51 shares of class A and 293.63 shares of class B common stock provided that if she died on or before September 1, 1970, the balance of the agreed payments would be canceled. Lillian Lorentzen was born on March 5, 1905. The 250 shares of preferred stock owned by Lillian Lorentzen were redeemed by Johnson, Inc., in 1965. Lillian Lorentzen was represented and advised by a member of a St. Paul law firm during negotiations for the sale of her stock to Johnson Irish. In the course of these negotiations, her attorney also had available all relevant financial information of Johnson, Inc., as of December 31, 1964, and made an appraisal of her capital stock interest therein. On July 7, 1966, BIC sold all of the stock of Johnson, Inc., it then owned to Universal Oil Products Company (UOP) for 112,540 shares of stock of UOP, which shares at that date had a value of approximately $11 million.UOP also purchased from Johnson Irish for $1,211,780 the 54.37 class B common shares and the life estate in 293.63 class B common shares and the successor life estate in 51 class A common shares of Johnson, Inc., stock which Johnson Irish had purchased in 1965 from *64 Lillian Lorentzen. After this purchase UOP held all the outstanding stock of Johnson, Inc., since the remaindermen of these shares, the life estate interest in which had been previously purchased by Johnson, Inc., or Johnson Irish, had transferred their remainder interests to BIC prior to the sale by BIC to UOP of all its Johnson, Inc., stock. The dividends paid by Johnson, Inc., on its common shares, in total and per share, were as follows for the years indicated: Year
Dividends paid on common shares
Dividends per common share 1961
$52,500
$ 70
1962
63,750
85
1963
63,750
85
1964
43,030
65
1965
79,440
120
Johnson, Inc., stock was not listed on any exchange nor the subject of any published quotations. The following schedule shows the net earnings of Johnson, Inc., and its Canadian subsidiary after taxes and dividends on preferred stock for the years indicated: Earnings 1962
1963 1961
Reported
Adjusted
Reported
Adjusted
1964
1965 $102,183
$172,625
[1] $236,963
$179,957
[1] $252,876
$377,331
$497,395
Preferred Stock Dividends 1961
1962
1963
1964
1965 $17,500
$21,250
$21,250
$16,250
$0
*65 Johnson, Inc's share of the earnings of its foreign subsidiaries as shown by its audit reports was as follows: 1961
1962
1963
1964
1965 $43,274
$141,366
($16,639)
$6,016
$37,355
The following schedule shows the assets and liabilities of Johnson, Inc., as of the end of the years 1961 through 1965: ASSETS
1961
1962
1963
1964
1965 Cash
$ 43,889
$ 127,459
$ 349,572
$ 439,026
$ 33,086
Notes receivable
65,954
46,222
45,625
-
-
Accts receivable
264,022
261,649
287,301
357,996
611,291
Merchandise inventory
379,949
490,132
654,457
793,991
1,005,543
Commissions accrued
-
39,308
-
-
-
Supplies inventory
-
9,427
9,227
6,605
4,315
Prepaid expenses
5,474
7,100
19,594
27,358
37,734
Total Current Assets
759,288
981,296
1,365,777
1,624,976
1,691,969
Investments [1]
12,102
12,102
11,602
21,728
27,642
Fixed Assets
797,746
883,660
996,210
1,179,893
1,190,744
Less: Accum depreciation
(206,882)
(269,260)
(328,922)
(390,322)
(421,240)
Fixed Assets (net)
590,864
614,400
667,288
789,571
769,504
Officers' life insurance
30,194
31,269
32,413
33,697
34,994
Accts receivable (officers & employees)
31,932
12,827
6,779
14,196
13,283
Experimental and research
3,918
9,054
28,433
7,501
13,183
Patents (net of amortization)
5,912
6,635
7,315
8,209
8,262
Deposits
1,125
1,125
1,125
1,125
1,125
Incorporating costs
-
-
-
392
294
Total Other Assets
73,081
60,910
76,065
65,120
71,141
Total Assets
$1,435,335
$1,668,709
$2,120,731
$2,501,395
$2,560,256
*66 LIABILITIES
1961
1962
1963
1964
1965 Notes payable
$ -
$ -
$ -
$ 80,000
$ 123,636
Vouchers payable
88,127
37,387
73,255
-
-
Accts payable
-
-
27,040
100,484
149,420
Dividends payable
70,000
85,000
85,000
59,280
79,440
Customers' credit balances
19,196
2,554
9,353
39,850
2,180
Accrued expenses
257,316
401,463
417,343
421,204
390,629
Income taxes
81,259
136,590
269,311
296,232
289,911
Total Current Liabilities
515,898
662,994
881,300
997,050
1,035,216
Long Term Debt
-
-
-
720,000
556,364
Deferred income
-
-
1,500
2,817
2,817
Deferred income tax
-
-
-
14,077
15,493
Total Other Liabilities
-
-
1,500
736,894
574,674
Stockholders' Equity --
Common, Class A
40,200
40,200
40,200
40,200
40,200
Common, Class B
34,800
34,800
34,800
34,800
34,800
Preferred, $100 par
25,000
25,000
25,000
25,000
25,000
Total Capital Stock
100,000
100,000
100,000
100,000
100,000
Retained earnings
819,437
905,715
1,137,929
1,467,451
1,876,616
Total
919,437
1,005,715
1,237,929
1,567,451
1,976,616
Less: Treasury Stock
-
-
-
(800,000)
(1,026,250)
Net Stockholders' Equity
919,437
1,005,715
1,237,929
767,451
950,366
Total Liabilities and Net Stockholders' Equity
$1,435,335
$1,668,709
$2,120,731
$2,501,395
$2,560,256
*67 Consolidated net worth and book value per share of common stock of Johnson, Inc., including its share of the value of all its foreign subsidiaries from 1961 through 1965, were as follows: 1961
1962
1963
1964
1965 Book value of Johnson, Inc., and Johnson Canada
$919,437
$1,005,715
$1,237,929
$767,451
$ 950,366
Book value of foreign subsidiaries (parent's share)
(est.) 67,462
(est.) 208,389
195,679
194,408
215,948
Less: Investments in subsidiaries
(12,102)
(12,102)
(11,602)
(11,602)
(11,602)
Consolidated book value
974,797
1,202,002
1,422,006
950,257
1,154,712
Less: Preferred shares
(25,000)
(25,000)
(25,000)
(25,000)
-
Consolidated common stock book value
949,797
1,177,002
1,397,006
925,257
1,154,712
Common shares
750
750
750
[1] 523.42
[1] 520.52
Consolidated book value per common share
1,266.39
1,569,34
1,862.67
1,767.71
2,218.38
*68 The December 31, 1965 audit report of Johnson, Inc., and its Canadian subsidiary showed the following net sales, earnings after taxes, and retained earnings at 10-year intervals since 1927, the figures for 1965 including those of its Canadian subsidiary: Year ended Dec. 31
Net sales
Earnings after taxes
Earnings retained in business 1927
$ 67,287
$ 1,941
$ 9,338
1937
209,025
12,269
2,543
1947
513,583
58,303
87,775
1957
1,537,721
126,058
531,267
1965
4,018,952
497,395
1,876,616
Sometime between June and August of 1965, Gus N. Benakis (hereinafter Benakis), a business broker with the firm of Mathieu & Benakis, Inc., which arranged mergers and acquisitions of companies, approached certain officers of Johnson, Inc., about possibly selling the company. Having been told that a sale might be considered, Benakis sent financial and product information circulars on Johnson, Inc., to various companies including UOP. During the latter part of 1965 representatives of several companies called on officers of Johnson, Inc., but made no offer to purchase the company's assets or its stock since in the view of these representatives the asking price *69 was excessive. A representative of UOP met with officers of Johnson, Inc. in mid-January 1966 and their negotiations led to the purchase by UOP of all shares of Johnson, Inc., as heretofore set forth. UOP also purchased the assets, business, and goodwill of Johnson Irish. Respondent in his notice of deficiency determined that the value of the BIC stock was $450 per share on December 29, 1962, $500 per share on December 29, 1963, $900 per share on December 29 and 31, 1964, $1,200 per share on December 31, 1965, and $1,400 per share on January 3, 1966. ULTIMATE FINDING OF FACT The value of the special common shares of BIC stock was $300 per share on December 29, 1962, $325 per share on December 29, 1963, $425 per share on December 29 and 31, 1964, and $600 per share on December 31, 1965 and January 3, 1966. OPINION The issue here is purely factual. Section 2512, I.R.C. 1954, [1] provides that if a gift is made in property, the value thereof at the date of the gift is to be considered the amount of the gift. Section 25.2512-2(a), Gift Tax Regs., provides *70 that the value of a gift of stock is its fair market value per share on the date of the gift, and section 25.2512-1, Gift Tax Regs., and numerous cases define fair market value of property as "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed." Hamm v. Commissioner, 325 F.2d 934, 937-938 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court, certiorari denied 377 U.S. 993 (1964), and cases there cited.
Since gifts were made of BIC stock on December 29, 1962, December 29, 1963, December 29 and 31, 1964, and December 31, 1965 and January 3, 1966, it is necessary to determine the fair market value of the BIC stock at each of these dates. The stock of BIC was closely held and there are no market quotations for this stock. It is therefore necessary in arriving at the fair market value of this stock to consider all relevant factors bearing on the value of the stock *71 such as the nature of the corporate business and its management, its financial history and earning capacity, the book value of the stock, the dividend policy of the company, and the general economic conditions affecting the business and its prospects in the future, as well as the values of the stock of corporations listed on a stock exchange which are engaged in the same or similar lines of business. Section 25.2512-2(f) (2), Gift Tax Regs., and Arc Realty Company v. Commissioner, 295 F.2d 98, 103 (C.A. 8, 1961), affirming on this issue 34 T.C. 484. The record in this case contains voluminous financial data on Johnson, Inc., the stock of which was the only asset of BIC and testimony of expert witnesses as to their opinion of the value of the BIC stock at the relevant dates. There is no dispute between the parties as to the initial approach to the valuation of the BIC shares at the dates of the gifts. They agree that in this case, since BIC is a personal holding company, it is necessary first to determine the value of BIC's sole underlying asset, 263 shares of class A common stock of Johnson, Inc. Their disagreement centers on the value of the 263 *72 shares of class A common stock of Johnson, Inc., at the relevant dates and the extent, if any, of discount necessary from the value of the underlying asset in determining the value of the BIC stock. Petitioners argue that the fair market values of class A common shares of Johnson, Inc., owned by BIC were no more than $1,107, $1,008, $3,416, and $4,504 at the end of 1962, 1963, 1964, and 1965, respectively. They base their argument mainly on the testimony of an expert witness who arrived at these values primarily on the basis of his opinion that, given the economic climate of the early 1960's, the size of Johnson, Inc., and the fact that the shares being valued were a minority interest, a price of from 6 to 10 times average earnings would be proper. He used the following computation to arrive at his figures: Years ended Dec. 31
Per share earnings
Price-earnings multiple utilized
Product
Less 40 percent discount
Per share value 1962
$230.66
8
$1,845.28
$ 738.11
$ 1,107.17
1963
240.00
7
1,680.00
672.00
1,008.00
1964
569.48
10
5,694.80
2,277.92
3,416.88
1965
750.75
10
7,507.50
3,003.00
4,504.50
This expert, in arriving *73 at the value of the BIC shares which were given by petitioners to their children and grandchildren, took 10 percent of the per-share value of Johnson, Inc., stock and applied a further discount of 40 percent because of the fact that BIC was a holding company and the BIC stock was nonvoting stock. His computation of the per-share value of the BIC stock was as follows: Years ended Dec. 31
Net asset value per share
Less 40 percent discount
Per share value
1962
$110.72
$ 44.29
$ 66.43
1963
100.80
40.32
60.48
1964
341.69
136.68
205.01
1965
450.45
180.18
270.27
Petitioners' expert witness used the average price-earnings ratio of a group of 14 selected small publicly owned companies in the metal manufacturing and metal fabrication industries in his valuation. The price-earnings ratios of these companies varied from a low of 4.4 to a high of 30.8 in 1962 and had similar variations in the other years, the least variation appearing in 1964, and the greatest in 1965 when the price-earnings ratios of these companies ranged from 5.8 to 69.3. There was nothing in the record to show that any of the companies used by this witness was truly comparable *74 to Johnson, Inc. Petitioners' expert witness in his valuation gave no consideration to the net asset value of the foreign subsidiaries of Johnson, Inc., as compared to its investment in those subsidiaries, to the continued pattern of growth in sales and earnings of Johnson, Inc., or to the actual sales of Johnson, Inc., stock which occurred in 1964 and 1965. Respondent relies primarily in support of his position on the testimony of his expert witness. This witness arrived at his valuation of Johnson, Inc.'s shares on the basis of their net tangible asset value, a capitalization of the latest year's earnings before and after taxes and of the 5-year average earnings before and after taxes, and consideration of the dividends paid by the company as well as the sales of the stock which had been made. This witness, in considering a price-earnings ratio, used three selected companies, the date with respect to which was public, and selected the mean ratio of those companies. Respondent's expert, in valuing the Johnson, Inc., stock, did make an allowance from what he might have otherwise considered the value of the stock to be because of the lack of marketability of the stock in a closely *75 held company. He stated that in his opinion the BIC stock was worth per share one-tenth of the Johnson, Inc., stock without additional discounts since (1) allowance had been made in valuing Johnson, Inc., because it was a closely held company; (2) the fact that BIC controlled Johnson, Inc., would offset what discount otherwise might be necessary because BIC was a holding company; and (3) BIC should be looked upon in effect as a closely owned investment company. In his opinion, no discount was necessary to BIC special common stock because of the limitation on the voting rights of that stock. Respondent's expert arrived at values of the Johnson, Inc., stock at the end of 1962, 1963, 1964, and 1965 in the amounts of $4,000, $4,500, $7,000, and $10,000, respectively, and at the value of BIC special common stock as one-tenth the value of the Johnson, Inc., stock or $400, $450, $700, and $1,000, respectively. He, as did petitioners' expert, assumed that the value of the stock of both Johnson, Inc., and BIC on January 3, 1966, would be the same as on December 31, 1965. There is nothing in the record to indicate that the companies used by respondent's expert in his appraisal of the *76 value of the Johnson, Inc., stock are any more comparable to Johnson, Inc., than are the companies used by petitioners' expert. The underlying data as to the growth of Johnson, Inc., its earnings, its net asset value, its ownership of foreign subsidiaries, its control by BIC, and its management by a major stockholder of BIC are agreed to by both parties and the experts employed by both parties. The differences between the parties lie in how they used this underlying information. Petitioners recognize that using twice the book value of the stock of Johnson, Inc., as the fair market value of its stock at the dates here pertinent results in a much higher value per share of Johnson, Inc., stock than petitioners contend is appropriate. Petitioners also recognize that some weight must be given to the actual sales of stock of Johnson, Inc., but argue that the sale made by Ward in August 1964 should not be considered as representative since that sale was based on his offer to purchase a majority interest.Petitioners recognize that Ward received over $5,000 a share for his Johnson, Inc., stock but argue that a substantial discount should be applied to this amount because it was in effect *77 valued as a majority interest. Petitioners then stress the other sale made by Eunice Reimer later in 1964 at substantially less per share and the 1965 sale by Lillian Lorentzen at somewhat less per share than the amount received by Ward for his stock in 1964. Respondent argues that these latter two sales were not significant, the first because of the lack of knowledge of the individual as to the affairs of Johnson, Inc., and the sale made by Lillian Lorentzen because she retained rights to her pension from the company and other interests that were not considered technically as a part of the sale of the stock. The parties very much disagree as to whether any weight should be given to the fact that in late 1965, at approximately the time of the sale by Lillian Lorentzen, the management of BIC and Johnson, Inc., was attempting to negotiate a sale of the Johnson, Inc., assets or stock and apparently had placed a higher price on the stock than certain prospective purchasers were willing to pay. Petitioners strongly contend that no consideration should be given to the actual sale to UOP of all the Johnson, Inc., stock in July 1966 for a price of approximately $12 million which would *78 be over $20,000 per share since the negotiation of this sale had commenced after the last date here involved, January 3, 1966. Respondent contends only that this sale should be considered in determining the prospects of the company in valuing the Johnson, Inc., stock as of the end of 1965. Respondent considers the asking price the officers of Johnson, Inc., had placed on that stock in late 1965 to bear on this factor. Once a value of the Johnson, Inc., stock has been arrived at, the question arises as to whether the value of a share of BIC special common stock is 10 percent of the value of the Johnson, Inc., stock and, if not, the discount that should be applied in arriving at the value of the special common shares of BIC stock which were the subjects of gifts on various dates. Because of BIC in effect being a closed end investment company, and also because of the voting restrictions on the special common shares, petitioners contend that at least a discount of 40 percent should be applied to one-tenth the value of the share of Johnson, Inc., stock to arrive at the value of a share of BIC special common stock. We have considered all of the evidence here of record, including *79 the opinions of the experts, the fact that petitioners, themselves, at the end of 1961 valued gifts of BIC common shares as distinguished from special common shares here involved at $300 per share, the price at which stock of Johnson, Inc., was sold and the circumstances surrounding these sales, the continuing growth of Johnson, Inc., the book value of its stock, the value above investment of its interest in its subsidiaries, its earnings over a period of years, its increasing earnings over the years, its dividend policy and the difference in the value of a minority interest from a controlling interest in arriving at the value of a share of Johnson, Inc., stock at the end of each of the years 1962 through 1965. We have also considered the fact of lack of marketability of the Johnson, Inc., stock because of the company being closely held. We have considered the sale of Johnson, Inc., stock to UOP only to the extent it shows the value that the management was placing on stock of Johnson, Inc., at the end of 1965 and the prospects of the company and of BIC at that time. We have also considered to what extent a discount should be applied to 10 percent of the value of a share of Johnson, *80 Inc., stock in arriving at the value of a share of BIC special common stock, because BIC was a holding company and there were voting limitations on the BIC shares. Having weighed all of the evidence and considered the experts' opinions, we have concluded that each share of stock of Johnson, Inc., had a value of at least $3,750 at the end of 1962, of $4,000 at the end of 1963, of $5,000 at the end of 1964, and of $7,500 at the end of 1965. However, in our view, a special common share of BIC stock at each of these dates would have a fair market value discounted by between 15 and 20 percent from 10 percent of the fair market value of a share of Johnson, Inc., stock. In arriving at this conclusion we have considered the facts that BIC is a holding company and there were voting restrictions on the special common shares, but have considered the discount usually resulting from these factors to be lessened because of the fact that BIC held the controlling interest in Johnson, Inc. Weighing all the evidence, we have determined, as set forth in our ultimate finding of fact, that each share of BIC special common stock had a value of $300 on December 29, 1962; $325 on December 29, 1963; $425 *81 on December 29 and 31, 1964; and $600 on December 31, 1965 and January 3, 1966; and do so hold. Decisions will be entered under Rule 155. Footnotes
1. Due to the proximity of the dates of these final gifts, the parties have treated the issue of valuation of the stock on December 31, 1965, as determinative of its value on January 3 as well. ↩
1. Adjustment per December 31, 1963, audit report. ↩
1. This includes investments in foreign subsidiaries. ↩
1. 662 shares outstanding adjusted to reflect D. Ward Johnson's and Eunice Reimer's remainder interests purchased and held in treasury by Johnson, Inc., using 3-1/2 percent table to value remainder interests. ↩
1. All references are to the Internal Revenue Code of 1954. ↩